[Crim. No. 21353. June 6, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
THEODORE FRANCIS FRANK, Defendant and Appellant.

[Crim. No. 22347. June 6, 1985.]

In re THEODORE FRANCIS FRANK on Habeas Corpus.

718

COUNSEL

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Supreme Court, Donald L. A. Kerson and Cheryl Lutz, Deputy State Public Defenders, for Defendant and Appellant and Petitioner.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Steve White, Chief Assistant Attorneys General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield, Jay M. Bloom, Keith I. Motley, Deborah D. Factor and A. Wells Petersen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—Defendant appeals from a judgment of death imposed under the 1977 death penalty law. (Former Pen. Code, §§ 190-190.6, Stats. 1977,

ch. 316, §§ 4-14, pp. 1256-1263.) He principally contends that the trial court erred in admitting in evidence certain personal writings seized from his apartment. As will appear, we conclude that the contention is meritorious but that the error requires reversal of the judgment only as to penalty.

On March 14, 1978, Cheryl S. left her two-and-one-half-year-old daughter Amy at the home of her babysitter before going to work. The babysitter lived in a community about three miles from Camarillo State Hospital near Highway 101. Amy was dropped off at 6:30 a.m.; she napped until 9 or 9:30 a.m., then went outside to play in the backyard, next to an alley. She soon reentered the house and began watching television in the living room. About 10:15 a.m. the babysitter was in the bedroom when she heard the front door close. A few minutes later she went to look for Amy but was unable to find her. The child was not seen alive thereafter.

Chet Allen lives in a rural area off Topanga Canyon Road, some miles from defendant's apartment. When the members of his family returned on March 14 they discovered their house had been broken into. The furniture was in disarray, the bedspread in one bedroom was rumpled, and a rag in the bathroom appeared to have blood on it. Allen did not call the police until two days later, however, when his dogs found the body of a little girl in the backyard, a few feet from a gully containing water from recent storms. A fingerprint analysis established that the dead child was Amy.

An autopsy revealed that Amy had sustained a number of injuries prior to her death. As a result of pressure from a pliers-like instrument, her nipples had been pinched and partially pulled away from her body. She had suffered three blows to her head, knife-like scratches on her chest and abdomen, and ligature marks on her wrist and ankles. The entrance to her vagina was torn and the hymen broken, possibly by insertion of a penis; her anus exhibited evidence of trauma indicating that a foreign object had been inserted there as well. Sperm were discovered in her vaginal area. Her blood had a .03 percent blood alcohol level, which could result if a child of her size had ingested two cans of beer shortly before death. The actual cause of death was strangulation.

Strong circumstantial evidence introduced at trial linked defendant with the abduction and death of Amy. In March 1978 defendant's wife was working at Camarillo State Hospital. Defendant did not work, but was attending college classes at the time on Mondays, Wednesdays, and Fridays. He drove his wife to work on the morning of Tuesday the 14th from their home in Woodland Hills. If he took the most direct route home from Camarillo State Hospital, he would have passed close to the neighborhood from which Amy

was abducted. He was scheduled to see his psychologist at 2 o'clock that afternoon, but did not keep the appointment.

Defendant was known to be a recidivist child molester; in fact, he had been released from the mentally disordered sex offender program at Atascadero State Hospital less than two months before Amy's disappearance. The court admitted evidence of his involvement in two other acts of child molesting. The first incident occurred on May 15, 1973, when a four-year-old girl named Rynetta C. was abducted from an alley in East St. Louis, Illinois. The abductor pulled her into his car, covered her with a coat, and drove her to a secluded location near a body of water. There he made her drink beer, took her clothes off, and tied her hands. He scraped her stomach with a knife and inserted the knife into her vagina. He also attached what appeared to be locking pliers to her vaginal area and immersed her in the water. She escaped to a nearby house, whose occupant saw and identified defendant and placed him at the scene of the molestation.

The second incident took place on July 5, 1978, a few months after the death of Amy. An eight-year-old girl named Linda G. was taken from an alley in Panorama City, California, by a man who lured her into his car. The man drove her about 16 miles down Highway 101 to the Griffith Park area, forced her to drink four beers, and proceeded to molest her. He pinched her breasts, and inserted a pen into her vagina and a tire gauge into her anus. He also forced her to orally copulate him, and finally plunged her into a stream. Eventually, he left her alone long enough for her to summon help. Linda identified defendant as her assailant, and so testified at trial.

Defendant was also linked to an attempted abduction of a young child on the morning of Amy's disappearance and in the same neighborhood. About 9 a.m. on March 14, 1978, Lillia Rocha, who lived near the home of Amy's babysitter, interrupted an apparent attempt to abduct her four-year-old son from an alley next to her house. Mrs. Rocha gave a detailed description of the man that matched defendant's appearance, but did not positively identify him.

A pair of vise-grips, a type of locking pliers, were found in defendant's apartment. At trial, there was extensive expert testimony on the many points of similarity between the distinctive pattern of the teeth of these vise-grips and the marks left on Amy's breasts. The witnesses concluded from the nature and extent of this correlation that defendant's vise-grips were the same tool that had been clamped onto Amy's body prior to her death.

After his arrest, defendant became friendly with another inmate named James Smith. He spoke with Smith on numerous occasions, admitting that

he was a child molester. Defendant decribed his method of luring or coercing his preferred victims—little girls between the ages of three and five—into his vehicle, driving them to remote locations, molesting them, then returning them to the place where he had picked them up.

Defendant also told Smith he had seen Amy on several occasions while driving his wife to work, and had twice attempted to pick her up. Both attempts occurred approximately one week before Amy's death; both failed when other persons intervened. Nevertheless, defendant denied having committed the crimes against Amy, offering at various times three different alibis. Later, however, he asked Smith to find out for him about the defenses of diminished capacity and temporary insanity; when Smith asked defendant directly whether he was guilty, defendant did not deny it and replied only that "if he was to tell me that, . . . it would be cutting his own throat."

Defendant also talked frequently with an inmate named Donald Cummings. He told Cummings that he often drove around after dropping his wife off at work; he admitted spotting Amy "a couple of times" during such rides. When discussing why certain persons repeatedly committed the same crime, defendant said, "take for instance, a person like me . . . I did this before, over and over, you get going doing something, your adrenalin builds up, the excitement is there." He added, however, that "this time, I got carried too far" and "things got out of hand." A third inmate testified that when asked how he could "do such a thing to a child," defendant replied, "I was with her that day, but they aren't going to know that."

Defendant was charged with murder under the 1977 death penalty statute. As special circumstances, it was alleged that the murder of Amy was wilful, deliberate and premeditated, and that it (1) was committed during the commission of a rape (former Pen. Code, § 190.2, subd. (c)(3)(iii)), (2) was committed during the commission of a kidnaping (*id.*, subd. (c)(3)(ii)), (3) was committed during the commission of child molesting (*id.*, subd. (c)(3)(iv)), and (4) involved the infliction of torture (*id.*, subd. (c)(4)). Additional counts charged him with forcible rape (Pen. Code, § 261, subd. 2), kidnaping (*id.*, § 207), and child molesting (*id.*, § 288). The information further alleged that each of the latter three crimes involved the intentional infliction of great bodily injury. (*Id.*, § 12022.7.)

The jury found defendant guilty of first degree murder, rape, kidnaping, and child molesting. It found the great bodily injury allegations and the kidnaping special circumstance to be true, but found the other three special circumstances not to be true. At the penalty phase the jury returned a verdict of death. This appeal is automatic. (*Id.*, § 1239, subd. (b).)

## I

While defendant was a patient at Atascadero State Hospital between October 1974 and January 1978 he used as personal notebooks a pair of pocket address books and a pocket datebook. In each he jotted down numerous random thoughts of an intimate nature, relating mainly to his emotional and sexual life. The notebooks were seized in a search of his apartment under color of a warrant, and portions of them were admitted in evidence against him at the guilt and penalty phases of his trial. His primary contention is that this evidence was the product of an unreasonable search and seizure.

■ This court, like the United States Supreme Court, seeks to encourage the use of warrants in preference to warrantless searches, however justifiable such a search may be as an exception to the warrant requirement. We therefore follow the rule that " 'courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' " (*People* v. *Mesa* (1975) 14 Cal.3d 466, 469 [121 Cal.Rptr. 473, 535 P.2d 337], quoting from *United States* v. *Ventresca* (1965) 380 U.S. 102, 109 [13 L.Ed.2d 684, 688-689, 85 S.Ct. 741].) The same rule applies when deciding, in doubtful or marginal cases, whether the warrant's description of the place to be searched or the things to be seized is sufficiently specific.

A close reading of the record, however, persuades us this is not such a doubtful or marginal case. On October 18, 1978, Officer Rogers presented an affidavit for a search warrant to a superior court judge. The judge issued a warrant to search defendant's apartment, listing in 16 clauses numerous items of evidence to be seized. The existence of some of the items was properly inferred from the condition of the body and the circumstances of the crime. (E.g., pliers, blonde hair, bits of skin or flesh, rope or cloth used to bind hands and feet, and the victim's clothing.) The existence of other items, however, could not have been deduced from known facts; rather, they were apparently boilerplate lists routinely incorporated into the warrant without regard to the evidence. (E.g., clothing of defendant that could contain "physiological matter" from the victim's body, tire marks, soil or other debris that could have come from the place where the body was found, and burnt remnants of the victim's clothing or hair.) Among the boilerplate clauses were three that authorized the police to search for and seize a wide variety of documentary evidence:

"1. Evidence tending to establish the identities of the occupants, users or owners of the residence, including, but not limited to utility bills or receipts, envelopes, traffic tickets, insurance papers or vehicle registration;

"2. Documentary evidence tending to show the whereabouts of Theodore Frank during March 14 and 15, 1978, including, but not limited to credit card receipts, receipts from businesses, records of telephone toll calls made during that period of time; cancelled checks made out or cashed on those dates, ledgers or personal diary notations which would indicate the whereabouts of Theodore Frank on those dates;

". . . . . . . . . . . . . . . . . . . . . . . . . .

"8. Scrapbooks, newspaper clippings, photographs (developed or undeveloped), tape recordings or writings which could relate to the death of Amy [S.] and would indicate either participation and/or an interest in that death by Theodore Frank; . . ."

Armed with this warrant, six law enforcement personnel descended on defendant's apartment at 7 o'clock the next morning. Defendant was not at home, but his wife opened the door and was served with the warrant. While two police officers apparently supervised the operation, four criminalists or "crime scene technicians" thoroughly searched the premises, looking through every room and closet, drawer and box, folder and envelope, that they could find. There is not the slightest showing that the criminalists ever referred to the warrant for guidance on what they could seize. Instead, they conceded at trial that their job was to search for anything that could conceivably link defendant to the crime, i.e., whether or not it was described in the warrant. For example, Sandra Taylor, one of the crime scene technicians, described her duties as follows: "we would go to a crime scene, we would photograph, we would search it for latents [i.e., fingerprints], and we would *pick up any physical evidence that was there,* package it and return it to the crime lab." She frankly admitted that her purpose in entering defendant's apartment on the morning in question was "To search the apartment for evidence that might link [defendant] in a case that we had." And she agreed that her procedure was simply, "If somebody saw something, they'd call your attention to it, you'd pick it up and mark . . . where it was found on the bag, and place it in the bag."

All the items thus seized were piled into a number of large "evidence bags" and taken to the police station. There a secretary went through the pile and made an inventory of its contents, after which they were sent to the crime laboratory. Apparently even the innocuous items were kept: near the end of the trial the prosecutor moved for admission of a number of his evidentiary offerings; when he reached the "evidence bags taken from [defendant's] residence" he asked to "pass those at this point," explaining frankly, "What I'm going to have to do, of course, is to go through the entire bags, which is very time-consuming, *because there is* [*sic*] *hundreds*

*of documents in each,* and separate what I want from what I don't want. . . . It will take me a half-hour to be prepared."

In this process the police indiscriminately seized literally hundreds of documents of all kinds, including books, magazines, pamphlets, papers, cards, bills, handwritten notes of classes and therapy groups, examination answers, family letters, correspondence with attorneys, and the notebooks at issue here. The latter were found in the top drawer of the bedroom dresser of defendant's wife. The chief criminalist testified that when a crime scene technician found the three notebooks, "He asked me to look at them; I did, and instructed him we would collect these three items." It is apparent that the notebooks—like all the documents taken in this search—were seized not because they were listed in the warrant, but simply because *after looking at them* the officer suspected they might be incriminating.

■ On this record we are compelled to hold that as to the challenged notebooks the warrant was impermissibly overbroad in two respects. Article I, section 13, of the California Constitution declares that "a warrant may not issue except *on probable cause,* supported by oath or affirmation, *particularly describing* the place to be searched and the persons and things to be seized." (Italics added.) (Accord, Pen. Code, §§ 1525, 1527, 1529.) We begin with the latter requirement. ■ In *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 249 [118 Cal.Rptr. 166, 529 P.2d 590], we restated the settled rule that "The requirement of particularity is designed to prevent general exploratory searches which unreasonably interfere with a person's right to privacy. . . . [T]his requirement is held to be satisfied if the warrant imposes a meaningful restriction upon the objects to be seized." In short, "Nothing should be left to the discretion of the officer." (*People* v. *Dumas* (1973) 9 Cal.3d 871, 880 [109 Cal.Rptr. 304, 512 P.2d 1208].)

■ In *Burrows* the warrant authorized search of a lawyer's office for " 'all books, records, accounts and bank statements and cancelled checks of the receipt and disbursement of money and *any* file or documents referring to [four named persons].' " (Italics added, 13 Cal.3d at p. 241.) As here, the officers conducted an exhaustive search of the premises that was not limited to documents relating to the persons specified in the warrant, and seized hundreds of papers unconnected with the latter. We unanimously held the search unreasonable because the warrant description of the things to be seized "was so broad that it authorized a general search of petitioner's offices" (*id.* at p. 248). "It is manifest that the warrant in the present case does not meet constitutional standards of specificity; it permitted the seizure of all of petitioner's financial records without regard to the persons with whom the transactions had occurred or the date of [those] transactions." (*Id.* at pp. 249-250.)

Again, in *Aday* v. *Superior Court* (1961) 55 Cal.2d 789 [13 Cal.Rptr. 415, 362 P.2d 47], the warrant authorized a search for the petitioners' 1959 income tax returns, for two named books, and for seventeen other general categories of documentary evidence such as "Checks," "Sales records," "Customers' correspondence," and "Any and all other records and paraphernalia connected with" the petitioners' business. In an opinion by Chief Justice Gibson, the court unanimously held the warrant description was fatally overbroad as to all items but the tax returns and the two named books: "Articles of the type listed in general terms in the warrant are ordinarily innocuous and are not necessarily connected with a crime. The various categories, when taken together, were so sweeping as to include virtually all personal business property on the premises and placed no meaningful restriction on the things to be seized. Such a warrant is similar to the general warrant permitting unlimited search, which has long been condemned." (*Id.* at p. 796.)

The same rule has been followed in our Courts of Appeal. Thus in *People* v. *Superior Court (Williams)* (1978) 77 Cal.App.3d 69 [143 Cal.Rptr. 382], the warrant authorized a search, inter alia, for "bills and receipts for the purchase and repairs" of a certain kind of industrial equipment. The trial court ruled that in this regard the warrant violated the constitutional requirement of specificity, and the Court of Appeal agreed: "The papers found in a briefcase, box, and filing box were seized under the general description of 'bills and receipts.' Under the description in the warrant the police officers had too much latitude in their search. Without a narrower description of what types of bills and receipts were to be seized or where they were to be found, the officers could have seized any piece of paper in the house, regardless of its relevance, on the pretext that it was described in the warrant. Therefore, the warrant was too general and the papers seized were properly suppressed." (*Id.* at p. 78; accord, *People* v. *Tockgo* (1983) 145 Cal.App.3d 635, 639-640 [193 Cal.Rptr. 503] [cigarettes, their containers, "invoices, cash receipts," and "any and all goods, and merchandise owned by [the burglary victim] and determined by the [victim] to be stolen"]; *Griffin* v. *Superior Court* (1972) 26 Cal.App.3d 672, 692-695 [103 Cal.Rptr. 679] ["Evidences of indebtedness" of the suspect, including "bills, contracts, checkstubs, checks"; "Telephone bills" showing calls between the suspect and other persons; and "Any papers showing names and addresses of associates" of the suspect].)

Whether the description in the warrant of the property to be seized is sufficiently specific is a question of law on which an appellate court makes an independent judgment. (*People* v. *Tockgo, supra,* at p. 641 of 145 Cal.App.3d; *People* v. *Superior Court (Williams), supra,* at pp. 76-77 of 77 Cal.App.3d; *Thompson* v. *Superior Court* (1977) 70 Cal.App.3d 101,

108 [138 Cal.Rptr. 603].) In making that judgment, moreover, the appellate court is confined to the language of the warrant itself; it cannot speculate on the subjective intent of the magistrate in authorizing the search. (*Thompson, supra,* at p. 111.)

 Applying these rules to the case at bar, we conclude that clause two of the warrant failed to satisfy the particularity requirement. Although it purported to limit the seizable "documentary evidence" to items showing the whereabouts of defendant on March 14 and 15, 1978, it did not otherwise describe or name those items except by impermissibly general categories such as "credit card receipts," "records of telephone toll calls," "cancelled checks," and "personal diary notations." In order to know whether defendant's apartment contained any documents in any of these categories, it would inevitably be necessary for the police to rummage through *all* defendant's personal papers and read enough of each to learn its contents—as the criminalist on the scene apparently did with respect to the three notebooks in issue. This is a far cry from authorizing a search for certain specifically named books, as in *Aday,* and it is unlawful for the reasons stated in *Burrows* and *Aday.*

The same analysis applies a fortiori to clause eight of the warrant. Again it described the papers to be seized only by general categories—"scrapbooks," "photographs," "tape recordings," and "writings"—and purported to limit them to items that "could relate" to the victim's death and "would indicate" either "participation" or "an interest" in that death by defendant. The vagueness of the latter language undermined any limiting effect it might have had; and in any event, as with clause two, to execute this clause it would be necessary for the police both to rummage through all defendant's "writings" and to read enough of each to learn its contents. Neither of the clauses thus "impose[d] a meaningful restriction upon the objects to be seized," within the meaning of *Burrows* (13 Cal.3d at p. 249) and *Aday* (55 Cal.2d at p. 796).

The vice of an overbroad warrant is that it invites the police to treat it merely as an excuse to conduct an unconstitutional general search. Applicable to the case before us is the following language of the dissent in *People v. Superior Court (Meyers)* (1979) 25 Cal.3d 67, 82 [157 Cal.Rptr. 716, 598 P.2d 877]: "The Constitution commands, however, that the warrant specify the 'things to be seized'—not merely 'enough of the seizable things to persuade the magistrate to allow the police to enter and search for more.' Yet that is essentially what happened here. Although [Officer Rogers] went through the motions of obtaining a warrant, his ensuing actions prove that he intended to use it simply as a license to get inside defendant's house; having done so, he admittedly ignored the list of property specified in the

warrant, searched every nook and cranny of the premises, and seized every article selected for him by the [crime scene technicians]. In other words, after he had gained entry into the premises the officer was obviously no more interested in the warrant than a theatergoer is concerned with his ticket once he has been seated. No court in the land should countenance a scheme that reduces the high office of a search warrant to the level of a mere ticket of admission."[1]

It is no answer to say that most of the papers seized in this search turned out to be innocuous and were not introduced into evidence against defendant. The very fact that many innocent items were taken itself demonstrates that the warrant was overbroad: as Justice Brennan reasoned in *Andresen* v. *Maryland* (1976) 427 U.S. 463, 493 [49 L.Ed.2d 627, 650, 96 S.Ct. 2737] (dis. opn.), a case in which many documents were indiscriminately seized in a lawyer's office, "The question is not how those warrants are to be viewed in hindsight, but how they were viewed by those executing them. The overwhelming quantity of seized material that was either suppressed or returned to petitioner is irrefutable testimony to the unlawful generality of the warrants."

■ The second way in which this warrant was overbroad is even plainer. The Constitution and the statutes forbid the issuance of a warrant "except on probable cause." ■ In *People* v. *Cook* (1978) 22 Cal.3d 67, 84, footnote 6 [148 Cal.Rptr. 605, 583 P.2d 130], we carefully restated the standard of such probable cause as follows: for the purpose of issuing a search warrant the standard of probable cause is "whether the affidavit [1] states facts [2] that make it substantially probable [3] that there is specific property [4] lawfully subject to seizure [5] presently located [6] in the particular place for which the warrant is sought." ■ The first of these requirements is a precondition of all the others, and has been separately codified in our statutes: "The affidavit or affidavits *must set forth the facts* tending to establish the grounds of the application, or probable cause for believing that they exist." (Pen. Code, § 1527, italics added.)

Again our decision in *Burrows* is in point. After finding the warrant description to be overbroad on its face, we reasoned: "An equally important

---

[1]The search thus violated guidelines set forth in a manual jointly published by the California District Attorneys Association and the Los Angeles County District Attorney's office. Reflecting settled rules of law, the manual advises police officers that "A search warrant cannot be used as a pretext for a general exploratory search," and that "Each officer searching must know what items are listed on the warrant and *can search for those items only.*" (Italics added.) (Chrystie & Schirn, Search Warrants (3d ed. 1984) pp. 10-7, 10-8.)

reason for holding the search of petitioner's office illegal is that the affidavit in support of the warrant was insufficient to justify a search of any of petitioner's records except those relating to the persons named in the affidavit. *It is axiomatic that a warrant may not authorize a search broader than the facts supporting its issuance.* [Citation.] The testimony of [Deputy District Attorney] Davis in support of the warrant related only to petitioner's alleged misconduct with regard to the statements made by Miller; Davis did not relate any *facts* supporting the issuance of the warrant authorizing an unlimited search for and seizure of all of petitioner's records of the receipt or disbursement of money, even assuming arguendo that a warrant containing such broad language would be valid." (Italics added.) (13 Cal.3d at p. 250; accord, *Thompson* v. *Superior Court* (1977) *supra,* 70 Cal.App.3d 101, 110; *Griffin* v. *Superior Court* (1972) *supra,* 26 Cal.App.3d 672, 694.)

The affidavit in the case at bar contained 24 pages of factual allegations. They described in detail the disappearance of Amy S., the condition of her body when found, and considerable circumstantial evidence pointing to defendant's guilt, including prior and subsequent similar acts of child molesting in California and elsewhere. The affidavit concluded by describing the acts that defendant apparently committed on his victim, and reasonably inferred therefrom that he may have taken "the items which he used to perform these acts on her with him and, perhaps, also her clothes in his vehicle to his home." The affidavit thus furnished probable cause to believe that certain specific items of real evidence—e.g., pliers, bits of skin, hair, and the victim's clothes—might be found in defendant's apartment. But nowhere in all these 24 pages was there alleged *one single fact* that gave probable cause to believe that any of the boilerplate allegations of the warrant were true. In particular, the affidavit failed to state any fact whatever to support an inference that defendant actually possessed the "personal diary notations" or "writings" listed in clauses two and eight of the warrant, or that if he did, they were "presently located in the particular place" to be searched, as the Constitution requires. In short, nothing in the affidavit gave any factual basis for the magistrate to find it was substantially probable that defendant's apartment contained any documentary evidence either of his whereabouts at the time of the crime—more than seven months earlier—or of any special interest he may have had in that crime.[2]

 "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched and seized are located on

---

[2]The same is true of the first clause of the warrant: the affidavit fails to allege any fact, for example, to support the warrant's authorization to search for "traffic tickets" in defendant's apartment. Nor would it have been reasonable for the magistrate to assume that all child molesters are ipso facto traffic scofflaws.

the property to which entry is sought." (*Zurcher* v. *Stanford Daily* (1978) 436 U.S. 547, 556 [56 L.Ed.2d 525, 535, 98 S.Ct. 1970].) With exceptions not here applicable (*Theodor* v. *Superior Court* (1972) 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234]; *People* v. *Cook* (1978) *supra,* 22 Cal.3d 67), a court cannot resort to facts outside the affidavit to determine whether it furnishes such reasonable cause. If the necessary facts are not stated in the affidavit, it comes too late for the prosecution to attempt to fill the gaps after the defendant's privacy has been invaded and his property seized, just as it cannot belatedly justify a warrantless search by facts of which the officer was unaware at the time (*People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186, 198 [101 Cal.Rptr. 837, 496 P.2d 1205], and cases cited). To hold otherwise would defeat the entire purpose of submitting the issue to an impartial magistrate before conducting the search. (See *People* v. *Cook* (1978) *supra,* 22 Cal.3d at p. 84.)

█ On this record, accordingly, we must conclude that the finding of probable cause to search for the challenged notebooks was based not on facts but on mere speculation—or worse, on boilerplate allegations routinely incorporated into the affidavit without regard to the evidence. ██ █ ██ It follows that as to those notebooks the warrant impermissibly "authorize[d] a search broader than the facts supporting its issuance," within the meaning of *Burrows.* (13 Cal.3d at p. 250.)[3]

█ The question of prejudice remains. In the guilt phase, only a very small portion of the notebooks was introduced into evidence; approximately 98 percent of the entries were either not offered by the prosecution or were stricken by the court. The few entries finally admitted included reflections

---

[3]Because the evidence here challenged was obtained under color of a warrant, defendant bore the burden of demonstrating that the search was unreasonable because the warrant was invalid. (See *Theodor* v. *Superior Court* (1972) *supra,* 8 Cal.3d 77, 101.) We recognize that his objection to this evidence on the ground of the overbreadth of the warrant could have been more specific. But while in a noncapital case a claim of erroneous admission of evidence will not be reviewed in the absence of a timely and proper objection (e.g., *People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048]), we have long followed a different rule in capital cases. On an appeal from a judgment imposing the penalty of death, a technical insufficiency in the form of an objection will be disregarded and the entire record will be examined to determine if a miscarriage of justice resulted. (*People* v. *Bob* (1946) 29 Cal.2d 321, 328 [175 P.2d 12].) The *Bob* rule is even more relevant today, in light of the recognition by the United States Supreme Court of the fact that death is "'profoundly different from all other penalties'" (*Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed. 1, 8, 102 S.Ct. 869]) and its repeated holdings that a capital defendant is therefore entitled to enhanced procedural protections against arbitrary infliction of the supreme penalty. Indeed, this court recently cited *Bob* in support of its promise that in capital cases it will review trial errors even when defense counsel has failed to complain of them on appeal. (*People* v. *Easley* (1983) 34 Cal.3d 858, 864 [196 Cal.Rptr. 309, 671 P.2d 813].)

by defendant on his propensity to molest children, general remarks about his modus operandi, and specific references tending to link him with the Rynetta C. offense. But ample other persuasive evidence was introduced by the prosecution on each of these points. The fact that defendant is a child molester has never been in doubt. Linda G. identified him on the stand as her assailant, and in his own testimony he admitted molesting her in the manner she described. As to the Rynetta C. offense, the witness who found the victim of that attack saw and identified defendant as the perpetrator, and so testified at trial. Finally, defendant's modus operandi was established by his conduct in the latter two cases: it included a number of distinctive and bizarre acts, such as forcing the children to drink beer, inserting metal objects into their vaginas or anuses, violently pinching their breasts with pliers or by hand, and immersing his victims in a body of water.

Additional evidence linked defendant to Amy's murder. He drove near her neighborhood each time that he returned from taking his wife to work; on the day of the abduction, he failed to keep a medical appointment. An hour or so before Amy disappeared, Mrs. Rocha foiled an apparent attempt of a man to abduct her own child from an alley near the house where Amy was staying; she gave the police a detailed description of the suspect, and it closely matched defendant's distinctive appearance. Perhaps most important, a pair of locking pliers were lawfully found in defendant's apartment, and extensive expert testimony at trial established the very high probability that it was the same tool that had been used by the murderer on Amy's body. Finally, while he was in jail awaiting trial defendant admitted to fellow inmates that he was a child molester and had twice attempted to abduct Amy; without expressly confessing, he impliedly also admitted his guilt of Amy's death.

It is true that the prosecutor mentioned the notebooks several times in his argument to the jury, but a fair reading of that argument shows he placed far more emphasis on all the other evidence of defendant's guilt discussed above. He particularly stressed the pliers found in defendant's apartment, and the many points of similarity between the modus operandi in this case and in the two prior crimes proved against defendant.

The error in denying defendant's motion to suppress the notebooks on the ground of warrant overbreadth was a violation of California statutory law (Pen. Code, §§ 1525, 1527) and the California Constitution (art. I, § 13). Its effect must therefore be judged by the California harmless error standard (*id.*, art. VI, § 13) as explicated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (See, e.g., *People* v. *Blair* (1979) 25 Cal.3d 640, 667 [159 Cal.Rptr. 818, 602 P.2d 738].) Applying that test, we conclude after a review of the entire record that in the absence of the error it is not reasonably probable that a result more favorable to defendant would have been

reached on the question of guilt. ▮▮ ▮▮ ▮▮ ▮▮ For similar reasons, whether or not the ruling also constituted federal constitutional error we are of the belief that on this record it was harmless beyond a reasonable doubt on the guilt issue. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)[4]

## II

▮▮ We next address defendant's contention that the judgment should be set aside because the trial court erred in admitting evidence of the two similar uncharged offenses committed by him, i.e., against Rynetta C. and Linda G. Defendant does not challenge the admissibility of the other-crimes evidence under Evidence Code section 1101, subdivision (b): he expressly concedes that the evidence had probative value in establishing identity as a necessary element of the prosecution's case-in-chief, and he does not argue that the court abused its discretion in admitting this evidence. Rather, he contends the court committed prejudicial error because it did not make an explicit, on-the-record finding that the probative value of the evidence substantially outweighed its potential prejudicial effect, which it must do when an objection is raised under Evidence Code section 352.[5]

▮▮ Defendant relies primarily on *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], in which we reaffirmed the rule that "on a motion invoking [section 352] the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value" (*id.* at p. 25). We explained that "the reason for the rule is to furnish the appellate courts with the record necessary for meaningful review of any ensuing claim of abuse of discretion; an additional reason is to ensure that the ruling on the motion 'be the product of a mature and careful reflection on the part of the judge,' i.e., to 'promote judicial deliberation before judicial action'" (*ibid.*). ▮▮ In *Green,* the defendant argued that the probative value of certain evidence was outweighed by its prejudicial effect, impliedly invoking section 352 as a ground for excluding it. The court admitted the evidence

---

[4]In a petition for habeas corpus filed in conjunction with the appeal, defendant contends he was denied effective assistance of counsel because his trial attorney failed to object on the ground that admission of the notebooks also violated certain other constitutional guarantees. (U.S. Const., 1st & 5th Amends.; Cal. Const., art. I, §§ 1, 2, 15.) Whether or not such objections would have been well taken, counsel's failure to make them was evidently not prejudicial in view of our holding that the admission of these notebooks, although error, was harmless. Any such failure to object thus does not provide a basis for reversal on the ground of ineffective assistance of counsel. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

[5]Section 352 provides in part: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ."

and gave an appropriate limiting instruction, but it provided no explanation of the reasoning underlying its ruling. We held that the court erred in admitting the challenged testimony "without making an explicit determination that [the] risk of undue prejudice did not substantially outweigh the probative value of the evidence." (*Id.* at p. 26; accord, *People* v. *Holt* (1984) 37 Cal.3d 436, 451-455 [208 Cal.Rptr. 547, 690 P.2d 1207]; *People* v. *Leonard* (1983) 34 Cal.3d 183, 187-189 [193 Cal.Rptr. 171, 666 P.2d 28].) Nevertheless, we concluded that the court's error in admitting the evidence without articulating on the record its reasons for doing so was harmless because the evidence was merely cumulative; a subsequent witness testified to the same facts as those related in the improperly admitted testimony. (27 Cal.3d at pp. 26-27.)

Applying *Green* to the case at bar, we observe that during his argument in opposition to the admission of the other-crimes evidence defense counsel invoked section 352 several times. Although the objection was thus clearly before the court, it failed to make an explicit finding on the record that the probative value of the evidence outweighed the risk of prejudice. Under the rule of *Green* this was error.

However, on the record before us we find the error to be harmless. Undoubtedly the trial court was aware that the evidence in question was imbued with the substantial danger of prejudice that is inherent in proof of prior sexual offenses; such evidence obviously tended to label defendant as a recidivist sex offender in the minds of the jurors. Indeed, defense counsel did not even discuss why the challenged evidence was prejudicial, apparently because its inflammatory nature was never seriously in dispute. Instead, counsel for both parties devoted most of their argument to the question whether the other crimes were sufficiently similar to the offenses charged to warrant admission of the evidence. Thus, the issue whether the probative value of the evidence outweighed its prejudicial effect was before the court and plainly formed the basis of its ruling admitting the evidence. In fact, the other-crimes evidence in this case presented a paradigmatic example of the type of evidence the probative weight of which may justify admission despite its prejudicial effect. In the face of such a clear showing that the evidence was properly received, the court's omission to recite for the record its implied finding that probativeness outweighed prejudice did not result in a miscarriage of justice. Accordingly, the error was harmless. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) *supra,* 46 Cal.2d 818, 836.)

### III

Defendant contends the evidence is insufficient as a matter of law to support a finding of premeditation and deliberation. In *People* v.

*Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], we identified three types of evidence from which an inference of premeditation and deliberation may be drawn: (1) facts showing that the defendant engaged in planning activity before the killing; (2) proof of the defendant's prior conduct with the victim from which the jury could infer a motive for a planned killing; and (3) evidence that the manner of the killing was so particular and exacting that the jury could conclude it was carried out according to a preconceived design and for a specific reason. (*Id.* at pp. 26-27.)

Here the evidence of planning activity is especially strong. One witness testified that defendant admitted two previous attempts to kidnap Amy for the purpose of molesting her. On the day of the successful abduction, defendant kidnaped the child, drove her a substantial distance to a secluded location, broke into an unoccupied house, and carried out a series of methodically sadistic acts on her before killing her. These acts included forcing her to ingest alcohol, binding her limbs, inflicting cuts on her body with a knife, pulling on her nipples with locking pliers, and raping her—all in a manner consistent with his established pattern of child molesting. Clearly he had prepared the attack. Defendant argues that his planning activities were directed only to the goal of satisfying his sexual urges on the child, and not to killing her. However, from such elaborate preparation and execution the jury could reasonably infer that defendant planned all aspects of his crime, including the murder in which it culminated.

The evidence of motive supports the conclusion that defendant's purpose in planning to kill Amy was to escape detection and punishment. He undertook to molest the child at a secluded location where he would not be likely to be observed. From the fact that defendant had gagged Rynetta C. and thrust Linda G.'s panties into her throat to stifle the cries of each while he molested them, the jury could infer that he likewise intended to silence Amy by choking her. The severity of the wounds inflicted on her and the fact that defendant had previously been caught and punished for similar offenses further suggest he had a strong motive to prevent her from surviving to identify him and testify against him. To be sure, his remark to a fellow prisoner that "this time, I got carried too far" can be taken to imply that the killing may have been the result of a sudden explosion of violence, but the jury was not compelled to draw that inference. And in any event, defendant testified that in making that remark he was referring to an entirely different offense, his molestation of Linda G.

Citing evidence of trauma to the neck of the victim, the coroner testified that death resulted from strangulation. Such a manner of killing shows at least a deliberate intent to kill (*People* v. *Rowland* (1982) 134 Cal.App.3d 1, 9 [184 Cal.Rptr. 346]), although not necessarily premeditation and de-

liberation (*ibid.*). On the record of this case, however, strangulation is consistent with the conclusion that defendant killed Amy to conceal his crime; it would thus be more likely to support an inference of premeditation and deliberation than, for example, the haphazard infliction of multiple stab wounds that occurred in *Anderson, supra,* 70 Cal.2d 15. In any event, "the strong additional evidence of both planning and motive in the case is more than sufficient to sustain a finding of preconceived design." (*People* v. *Haskett* (1982) 30 Cal.3d 841, 850 [180 Cal.Rptr. 640, 640 P.2d 776].)

## IV

■ Defendant's final contention relating to the guilt phase is that the exclusion for cause of persons unalterably opposed to the death penalty deprived him of the right to a jury chosen from a representative cross-section of the community. The contention was rejected by a majority of this court in *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 (plur. opn.), 374 [197 Cal.Rptr. 803, 673 P.2d 680] (conc. opn. of Kaus, J.).

## V

■ Although the error in denying defendant's motion to suppress the notebooks was not prejudicial on the guilt phase (Pt. I, *ante*), it had a very different effect on the penalty phase. In that stage of the trial the role of the notebooks was much greater than in the guilt phase, and much less other, untainted evidence was introduced. Thus in his opening statement on the penalty phase the prosecutor repeatedly told the jury that he intended to rely primarily on defendant's own words, as they appeared in the notebooks, to justify the death sentence. He said, for example, that he would present "a great deal of evidence that the defendant has not one iota of remorse" and "most of that evidence is in the form of the notebooks." True to his promise, the prosecutor called no witnesses, but simply agreed to a stipulation with defense counsel as to the facts of two additional child molestations committed by defendant. After defendant put on his evidence, however, the prosecutor moved for the admission not only of the portions of the notebooks introduced on the guilt phase, but also of a number of additional entries from each book. The motion was granted over defendant's strong objections.

In his closing argument to the jury the prosecutor used the notebooks relentlessly for the purpose of obtaining a verdict of death. He referred to the notebooks dozens of times, quoted from them over and over again, and based his entire argument on repeated assertions that defendant deserved to die *because the notebooks proved* that he planned and executed these crimes deliberately, was not acting in the heat of passion, knew his conduct was

wrongful but enjoyed inflicting pain on his victims, and had no remorse afterwards.[6] After reading numerous passages to the jury, the prosecutor concluded, "There are other similar statements in his writings, they will all be given to you. I ask you to read them. Read them to determine what kind of a man this is."

In view of the dramatically greater role of the notebooks—and lesser role of other evidence—at this phase of the trial, it is impossible to conclude that the error in their admission was harmless on the issue of penalty. The error infected the entire proceeding on this question, and was therefore prejudicial under any test.

Because the judgment must be reversed as to penalty, we do not reach defendant's other claims of error.

The judgment is reversed insofar as it imposes the penalty of death and is affirmed in all other respects. The petition for habeas corpus is denied.

Broussard, J., concurred.

Reynoso, J., concurred in the judgment.

**BIRD, C. J.,** Concurring and Dissenting.—I respectfully dissent for the reasons set forth in my opinion in *People* v. *Fields* (1983) 35 Cal.3d 329, 374-386 [197 Cal.Rptr. 803, 673 P.2d 680] (dis. opn. of Bird, C. J.). Further, appellant's objections to the search warrant should be carefully re-

---

[6]The prosecutor's unremitting emphasis on defendant's own writings as the basis for his demand for the death penalty is illustrated by the following typical portion of his argument:

"[Defendant] analyzed himself and sat there and reviewed his thoughts and reviewed his sordid activities and *wrote about them.* [¶] *He wrote them down. He wrote them down,* his motives, his feelings or lack of feelings, his knowledge of the pain that he inflicted, his full knowledge and awareness of the suffering that he was visiting onto these children. [¶] And he's well aware of it. *And he writes it down in his own writing. In his own writing,* he says, in effect, 'I know what I do is wrong. I know it is very painful. I know it is horrible. I know that I'm visiting great horror on these children. But by golly, I like it. And I choose to do it again.' That's who we have here. That's who is before you.

"When you ask yourself a question, is this the type of crime, is this the type of person that is the worst, among the worst? Is this the type of person, the factors, when you add them up, add up to a conclusion that, in fact, he is the worst type of person. He committed the worst type of crime. [¶] He did so knowingly, with what's called malice aforethought, as you found, and rightfully so. Premeditation as you found, and rightfully so. With present knowledge that it's wrong, and how wrong it is, what he did.

"But he didn't care, because he enjoyed it. That is all that matters to you. *He writes of it. He writes statements,* for instance—and by the way, *we have the evidence of this in the form of the notebooks.* [¶] Now, the major portions of those notebooks were, of course, not presented to you. And we presented additional evidence in this hearing which is relevant to the question of penalty. [¶] These will be provided to you at the time you go to the jury room, *these additional entries into the notebooks.*" (Italics added.)

viewed and a significant instructional error at the penalty phase should be noted.

## I.

The majority hold that appellant's objections to the seizure of his personal diaries was sufficient because of a purported "different rule" regarding reviewability of errors in capital cases. (Maj. opn., *ante,* at p. 729, fn. 3.) I agree that the objections were sufficient to preserve the issue. A number of reasons, which are well-settled in our law and borne out by the record in this case, compel that conclusion.

This court has generally been reluctant to find that an accused forfeits his right to appellate review by failing to make a timely or proper objection, if such a finding would result in substantial injustice. Nearly 40 years ago, this court observed that "[n]otwithstanding the rule that the specific ground for an objection must be given and the particular portion of evidence which is inadmissible must be pointed out where other parts are admissible, 'technicalities should be liberally viewed when urged against a defendant in a criminal case. . . .'" (*People* v. *Bob* (1946) 29 Cal.2d 321, 325 [175 P.2d 12].) In essence, this principle recognizes that a failure to object is not necessarily the result of any conscious decision made by the accused, but rather "is [often] born of the inadvertence, negligence, inexperience, or incompetence of trial counsel." (*Wainright* v. *Sykes* (1977) 433 U.S. 72, 104 [53 L.Ed.2d 594, 619, 97 S.Ct. 2497] [dis. opn. of Brennan, J.]; see Wangerin, *"Plain Error" and "Fundamental Fairness": Toward a Definition of Exceptions to the Rules of Procedural Default* (1980) 29 DePaul L.Rev. 753, 757 [hereafter *"Plain Error"*].)[1]

The majority are correct in noting that this principle rings especially true in death penalty cases. As this court observed in *Bob,* "[t]he Legislature of California has taken extraordinary precaution to safeguard the rights of those upon whom the death penalty is imposed . . . by providing for an automatic appeal . . . and enjoining upon this court an examination of the record and the preparation of a formal opinion and decision from which it should appear that no miscarriage of justice has resulted. In view of this declared policy, . . . it would seem appropriate for this court to take a

---

[1]The Supreme Court has voiced similar concerns: "Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice." (*Hormel* v. *Helvering* (1941) 312 U.S. 552, 557 [85 L.Ed. 1037, 1041, 61 S.Ct. 719].)

liberal view of the technical rules applicable to criminal cases generally [citation] and examine the record with the view of determining whether or not in the light of all that transpired at the trial of the case a miscarriage of justice has resulted." (29 Cal.2d at p. 328.)

Witkin has suggested that "in any case involving a serious crime, *and particularly a capital case,* the requirement of a proper objection may be greatly relaxed." (Witkin, Cal. Evidence (2d ed. 1966) § 1292, pp. 1195-1196, italics added.) At least one state's high court has gone so far as to provide a "death penalty exception" to the rule requiring a proper and timely objection, reasoning that in such cases "[i]t is far more important to society and constitutional government that the accused be accorded a fair and impartial trial than that he be required to forfeit his life in expiation of his crime, no matter how guilty the facts fairly adduced might have proven him to have been." (*Edwards* v. *Commonwealth* (1944) 298 Ky. 366, 375 [182 S.W.2d 948]; see generally Comment, *The Contemporaneous Objection Rule: Time for a Re-examination* (1979) 67 Ky.L.J. 212, 220-221.) Illinois has for quite some time had a "plain error" rule—applied frequently in death penalty cases—which permits review of an unobjected-to ruling where the error affected the "substantial rights" of the accused. (Ill. Code Crim. Proc., § 121-9 (1963), repealed by Laws 1967, p. 3615, § 1, eff. Sept. 5, 1967, see now rule 615(a), Ill. Supreme Ct. Rules; see, e.g., *People* v. *Manzella* (1973) 56 Ill.2d 187, 195-196 [306 N.E.2d 16], overruled on other grounds in *People* v. *Huckstead* (1982) 91 Ill.2d 536, 548 [440 N.E.2d 1248]; see *"Plain Error,"* *op. cit. supra,* 29 DePaul L.Rev. at pp. 771-778.)

It is true that Evidence Code section 353 requires a timely and particularized objection to erroneously admitted evidence.[2] However, that requirement is not a hard and fast one. Even the Assembly Judiciary Committee comment to that statute permits an exception to the objection requirement. ("Section 353 is, of course, subject to the constitutional requirement that a judgment must be reversed if an error has resulted in a denial of due process of law.")

The objection requirement has a few other well established exceptions. As this court has noted, "[a]n objection is sufficient if it fairly apprises the trial court of the issue it is being called upon to decide. [Citations.] In a criminal case, the objection will be deemed preserved if, despite inadequate

---

[2]Evidence Code section 353 states in relevant part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ."

phrasing, the record shows that the court understood the issue presented." (*People* v. *Scott* (1978) 21 Cal.3d 284, 290 [145 Cal.Rptr. 876, 578 P.2d 123]; see *People* v. *Bob, supra,* 29 Cal.2d at pp. 325-326.) In addition, if the trial court considered and ruled on the issue as if an objection had been properly made, appellate review is permitted. (*People* v. *Abbott* (1956) 47 Cal.2d 362, 372-373 [303 P.2d 730].)

In this case, appellant's written points and authorities on the overbreadth issue were brief and conclusory. The issue was raised in general terms with a few examples cited from the cases. However, the prosecutor's written response framed the issue more precisely for the court and made it clear that he fully understood the specific contention raised. His entire response to the overbreadth contention was devoted to a defense of paragraphs 2 and 8 of the warrant—the clauses dealing with "documentary evidence"—which are precisely the paragraphs at issue in this appeal.[3]

After reviewing at length several cases on the issue, the prosecutor concluded that "it is a rare case where there can be certainty as to precisely which *documentary* items are on the premises to be searched . . . ." (Italics added.) While appellant may have failed to explicitly specify which clause or clauses in the warrant he was challenging as overbroad, the prosecutor understood appellant's objections. As a result, the issue was squarely presented to the court by both sides.

When the matter came up for hearing, both parties submitted the overbreadth issue without further discussion. That submission must be viewed in the context of the written materials which were before the court. Since the prosecutor's response focused on the precise clauses which are at issue in this appeal, in essence the trial court *did* understand the objection and *did* rule on it, and no further discussion was necessary. Under *Bob, Scott,* and *Abbott,* these facts are sufficient to permit review of the overbreadth issues raised on appeal.

There is other decisional authority which permits this court to address the merits of appellant's claim. Consider *People* v. *Webb* (1967) 66 Cal.2d 107 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708], in which the appellant claimed various Fourth Amendment violations in the seizure of narcotics from his automobile. Trial counsel had made only a "general objection on the ground of illegal search and seizure in a colloquy with the court at the

---

[3]The "overbreadth" challenge raised in this appeal consists of two distinct but related contentions: (1) that the language of the warrant failed to describe with sufficient particularity which "documentary evidence" relating to Amy S.'s death could be seized, and (2) that the facts set forth in the affidavit in support of the warrant failed to furnish probable cause to search for personal diaries.

commencement of trial." (*Id.,* at p. 111, fn. 1.) Nevertheless, "[i]n view of the fundamental constitutional question involved and the relative simplicity of the facts," this court "consider[ed] that objection to be continuous and sufficient to bring the matter before [it] on the merits." (*Ibid.;* see also *People* v. *Pranke* (1970) 12 Cal.App.3d 935, 949 [91 Cal.Rptr. 129] [an "objection made against a backdrop of . . . undisputed facts" is sufficient to give an appellant the right to raise a search and seizure issue for the first time on appeal. (dis. opn.)].)

The facts here are no more complex and the issues no less fundamental than in *Webb*. The seizure at issue involves the state's interference with a most precious right—the privacy of a citizen's personal papers. Since appellant's overbreadth claim relates solely to the warrant and its supporting affidavit rather than to any disputed issues of fact, only questions of law remain.

There are other reasons for reaching the overbreadth objection here. It is well established that the function of an objection is "to alert the [trial] court to the risk of error and permit it to avoid that error . . . ." (*People* v. *Velasquez* (1980) 26 Cal.3d 425, 444 [162 Cal.Rptr. 306, 606 P.2d 341], judgment vacated and cause remanded (1980) 448 U.S. 903 [65 L.Ed.2d 1132, 100 S.Ct. 3042], reiterated (1980) 28 Cal.3d 461 [171 Cal.Rptr. 507, 622 P.2d 952].)[4] Without an objection requirement, the prosecution would be deprived "of the opportunity to cure [a] defect at trial and '[the defendant would be permitted] to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal.'" (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048]; see *People* v. *Velasquez, supra,* 26 Cal.3d at p. 444, fn. 14.) The objection requirement also ensures fairness to both the opposing party and the trial court, guaranteeing each an opportunity to litigate and consider, respective-

---

[4]The objection requirement applies where the law is clear and well settled. In contrast, where a change in the law is sought on appeal, this court has deemed an objection unnecessary, holding that "a substantial change in the [law will] excuse an objection anticipating that decision." (*People* v. *De Santiago* (1969) 71 Cal.2d 18, 23 [76 Cal.Rptr. 809, 453 P.2d 353]; see *People* v. *Cannady* (1972) 8 Cal.3d 379, 387 [105 Cal.Rptr. 129, 503 P.2d 585].) To require an objection in such circumstances "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal." (*People* v. *Kitchens* (1956) 46 Cal.2d 260, 263 [294 P.2d 17]; see also *People* v. *Chavez* (1980) 26 Cal.3d 334, 350, fn. 5 [161 Cal.Rptr. 762, 605 P.2d 401]; *People* v. *Williams* (1976) 16 Cal.3d 663, 667, fn. 4 [128 Cal.Rptr. 888, 547 P.2d 1000]; see also *In re Woods* (1966) 64 Cal.2d 3, 7-8 [48 Cal.Rptr. 689, 409 P.2d 913].)

Moreover, no objection is required where the application of settled law to a new fact situation is unclear (*People* v. *Haston* (1968) 69 Cal.2d 233, 256, fn. 28 [70 Cal.Rptr. 419, 444 P.2d 91]), or where "the apparently prevalent contemporaneous interpretation" of the law is contrary to the contention sought to be reviewed on appeal. (*In re Gladys R.* (1970) 1 Cal.3d 855, 861 [83 Cal.Rptr. 671, 464 P.2d 127].)

ly, "the facts and inferences relating to the adverse party's contentions." (*People* v. *Manning* (1973) 33 Cal.App.3d 586, 601 [109 Cal.Rptr. 531].)

These principles apply, obviously, in the Fourth Amendment context.[5] Accordingly, this court had held that evidence admitted without any objection on search and seizure grounds may not be challenged for the first time on appeal. (*People* v. *Gallegos* (1971) 4 Cal.3d 242, 249-250 [93 Cal.Rptr. 229, 481 P.2d 237].)

The requirement of a *particularized* objection also holds true in the Fourth Amendment context. For example, it has been held that a stipulation to probable cause at trial bars review of that issue on appeal, since the prosecution was deprived of the opportunity to adduce evidence below on that point. (*People* v. *Payne* (1969) 1 Cal.App.3d 361, 364-365 [81 Cal.Rptr. 635].) Similarly, an accused's lack-of-probable-cause-to-arrest objection has been held insufficient to preserve a contention that the arrest was made outside the arresting officer's jurisdiction (*People* v. *Talley* (1967) 65 Cal.2d 830, 837-838 [56 Cal.Rptr. 492, 423 P.2d 564]), or that the officers did not comply with the knock-notice requirements of Penal Code section 1531.[6] (*People* v. *Kizzee* (1979) 94 Cal.App.3d 927, 934 [156 Cal.Rptr. 784]; *People* v. *Lopez* (1978) 81 Cal.App.3d 103, 107-108 [87 Cal.Rptr. 178].) Also, a lack-of-consent objection to the admission of a recorded telephone conversation (see § 631) has been held insufficient to preserve the contention that the consent was coerced. (*People* v. *Blend* (1981) 121 Cal.App.3d 215, 229 [175 Cal.Rptr. 263].)

A premise common to all of the foregoing cases—none of which involve challenges to the facial validity of a search warrant or its supporting affidavit—is that an objection is necessary to give the opposing party and the court an opportunity to offer and consider, respectively, " 'additional evidence on the issue raised by the objection.' "[7] (*People* v. *Payne, supra,* 1

---

[5]For convenience, throughout this opinion the phrase "Fourth Amendment" will refer to both the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution. (See, e.g., *People* v. *Cook* (1978) 22 Cal.3d 67, 81, fn. 4 [148 Cal.Rptr. 605, 583 P.2d 130]; *People* v. *Triggs* (1973) 8 Cal.3d 884, 891-892, fn. 5 [104 Cal.Rptr. 408, 506 P.2d 232].)

[6]All statutory references are hereinafter to the Penal Code unless otherwise indicated.

[7]This court's decisions requiring particularized search and seizure objections are consistent with this premise. For example, in *In re Joe R.* (1980) 27 Cal.3d 496 [165 Cal.Rptr. 837, 612 P.2d 927], this court considered appellant's lack-of-consent objections to a warrantless entry—preserved by a timely trial court objection—but refused to consider for the first time on appeal whether the officers' warrantless arrest was excused by exigent circumstances. As the court stated, "we do not know what additional showing of exigency might have been made if illegality of the entry had been asserted in the trial court . . . ." (*Id.,* at p. 510.)

Similarly, in *People* v. *Rogers, supra,* 21 Cal.3d at pages 547-548, the court refused to

Cal.App.3d at p. 365.) Conversely, if *no* additional evidence could have been presented had a more particularized objection been proffered, fairness has been preserved. Where the record is as complete as it would have been had a more particularized objection been made, appellate review of the ruling works no injustice to the opposing party and does not foreclose the trial court from having made a more informed ruling.

This corollary applies when an overbreadth challenge is made to a search warrant or its supporting affidavit. It is established that "[w]hether the description in the warrant of the property to be seized is sufficiently definite is a question of law on which an appellate court makes an independent judgment." (*Thompson* v. *Superior Court* (1977) 70 Cal.App.3d 101, 108 [138 Cal.Rptr. 603].) Further, the reviewing court "is confined to the language of the warrant; [it] cannot speculate as to the subjective intent of the magistrate when he signed the warrant." (*Id.*, at p. 111.) Furthermore, with exceptions not here applicable,[8] neither a trial court nor a reviewing court may resort to facts outside the affidavit to determine whether the affidavit establishes probable cause for the issuance of the warrant. Consequently, the prosecution may not present, and the trial court may not consider, any additional testimony in defending and ruling on, respectively, an accused's overbreadth objection. Since review of the sufficiency of the warrant and its affidavit must be had without resort to such evidence, it is clear that appellant's overbreadth objection was sufficient to preserve his conventions asserted in this appeal.

## II.

Since appellant's overbreadth objections are proper, I turn to the merits of his claim.

On October 18, 1978, the superior court issued a warrant to search the home of appellant and his wife. Among the items authorized by the warrant to be seized were "(2) documentary evidence tending to show the whereabouts of Theodore Frank during March 14 and 15, 1978, including, but

---

consider, in the absence of a trial court objection, a "*Harvey/Madden*" (*People* v. *Harvey* (1958) 156 Cal.App.2d 516 [319 P.2d 689]; *People* v. *Madden* (1970) 2 Cal.3d 1017 [88 Cal.Rptr. 171, 471 P.2d 971]) contention that an officer who furnishes another officer with information which the latter uses to make an arrest must have had probable cause for the arrest. As the court stated, to excuse an objection in these circumstances "would deprive the People of the opportunity to cure the defect at trial . . . ." (21 Cal.3d at p. 548.)

As explained *post,* these cases—and the premise they stand for—are inapposite because no such opportunity was lost.

[8]See *People* v. *Kurland* (1980) 28 Cal.3d 376 [168 Cal.Rptr. 667, 618 P.2d 213], *People* v. *Cook, supra,* 22 Cal.3d 67, *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234].

not limited to . . . personal diary notations which would indicate the where-abouts of Theodore Frank on those dates" and "(8) [s]crapbooks, newspaper clippings, photographs (developed or undeveloped), tape recordings or writings which could relate to the death of Amy [S.] and would indicate either participation and/or an interest in that death by Theodore Frank[.]"

A search was conducted the next day. Among the numerous items seized were unused wedding announcements, various sales and advertisement brochures, two novels, and notes and diagrams for ballroom dance steps.

In addition, three pocket-sized notebooks were found in appellant's wife's dresser drawer.[9] The notebooks were the diary of appellant's private thoughts, written between 1974 and 1976, while he was in custody at Atascadero State Hospital. Appellant had been committed for an indeterminate period for treatment as a result of prior child molestation convictions. (See former Welf. & Inst. Code, § 6316.) The last entry in the diary was made approximately a year and a half *prior* to the crimes for which the police were seeking evidence.

The thoughts set down in these diaries are detailed and of an intimate nature. They concern appellant's struggle to understand the motivations behind the crimes he had committed and were utilized as an aid to his psychiatric treatment at the hospital.

A number of passages from the diaries were entered into evidence against appellant at trial to demonstrate that he had engaged in a pattern of prior behavior similar to that involved in the crime charged. In addition, the prosecutor quoted extensively from the diaries during his closing arguments at both the guilt and penalty phases.

The freedom from governmental intrusion into an individual's papers has long been recognized in the law. Even before the American Revolution, the English Court of Common Pleas stated "Papers are the owner's goods and chattels: they are his dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection . . . ." (*Entick* v. *Carrington* (1765) 19 Howell State Trials 1029, 1066.)

This concern for the inviolability of one's private papers has also been reflected in opinions of the United States Supreme Court. Justice Marshall has observed that the court's decisions which have afforded protection to private papers under the Fifth Amendment "represent a deeply held belief

---

[9]One of the notebooks had on its cover the date "1975." The other two were identified on their covers as address books.

on the part of the Members of [the] Court throughout its history that there are certain documents no person ought to be compelled to produce at the Government's request." (*Fisher* v. *United States* (1976) 425 U.S. 391, 431-432 [48 L.Ed.2d 39, 68, 96 S.Ct. 1569] and cases cited therein (conc. opn.).)

Justice Brennan has noted that "[a] precise cataloguing of private papers within the ambit of the privacy protected by the [Fifth Amendment] privilege is probably impossible. . . . [¶] . . . [W]hile letters, being necessarily interpersonal, are not wholly private, their peculiarly private nature and the generally narrow extent of their disclosure would seem to render them within the scope of the privilege. *Papers in the nature of a personal diary are a fortiori protected under the privilege.*" (*Id.,* at pp. 426-427 [48 L.Ed.2d at pp. 65-66], italics added (conc. opn.).)

Several lower federal courts have suggested that a diary containing incriminating material may not be used against its author without breaching Fifth Amendment standards. (See, e.g., *United States* v. *Stern* (S.D.N.Y. 1964) 225 F.Supp. 187, 192; *United States* v. *Boyette* (4th Cir. 1962) 299 F.2d 92, 95, cert. den. *sub. nom., Mooring* v. *United States* (1962) 369 U.S. 844 [7 L.Ed.2d 848, 82 S.Ct. 875].)

These concerns also arise in the Fourth Amendment context. Even when the "mere evidence" rule was abandoned in *Warden* v. *Hayden* (1967) 387 U.S. 294, 300-301 [18 L.Ed.2d 782, 788, 87 S.Ct. 1642], the Supreme Court explicitly reserved the question as to whether "there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure." (*Id.,* at p. 303 [18 L.Ed.2d at p. 789]; see also *People* v. *Sirhan* (1972) 7 Cal.3d 710, 740 [102 Cal.Rptr. 385, 497 P.2d 1121].) And, as the Colorado Supreme Court has observed, "it would be difficult to imagine what 'papers and effects' should be more entitled to privacy than one's personal diary." (*People* v. *Williams* (1976) 192 Colo. 249 [557 P.2d 399, 403], fn. omitted.) The drafters of the Model Code of Pre-Arraignment Procedure have explicitly recognized that personal diaries should not normally be subject to governmental seizure. (Model Code of Pre-Arraignment Procedure (1975) § SS 210.3, subd. (2), p. 124.)[10]

---

[10]Beyond the cited reasons for according some special protection to diaries, there are specific factors in the present case which may support that result.

The diaries were written while appellant was involuntarily committed to a state hospital for treatment as a mentally disordered sex offender. The commitment was for "an indeterminate period" of time. (Former Welf. & Inst. Code, § 6316.) The length of actual commitment depended in large part on how well he responded to the treatment.

According to the testimony below, that treatment largely consisted of "conversation,

For these reasons, warrants which deal with the seizure of personal diaries deserve more than superficial scrutiny. Such warrants should never be issued when no factual justification appears in the affidavit. When such justification does appear, the warrant should be drafted with specificity so as to ensure the sanctity of personal writings which are not relevant to the criminal activity being investigated. Although these rules are firmly rooted in the Constitution, they were not followed in this case. As a consequence, the diaries were illegally seized and the trial court erred in admitting them into evidence.

 The probable cause sufficient for issuance of a warrant requires a showing that makes it "substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought." (*People* v. *Cook, supra,* 22 Cal.3d at p. 84, fn. 6.) That showing must appear in the affidavit offered in support of the warrant. (*Ibid.;* see *People* v. *Stout* (1967) 66 Cal.2d 184, 193 [57 Cal.Rptr. 152, 424 P.2d 704].)

The affidavit must set forth more than the "'mere conclusion'" of the affiant that the items sought are located on the premises to be searched. (*Aguilar* v. *Texas* (1964) 378 U.S. 108, 113 [12 L.Ed.2d 723, 728, 84 S.Ct. 1509], overruled on other grounds *Illinois* v. *Gates* (1983) 462 U.S. 213, 238 [76 L.Ed.2d 527, 548, 103 S.Ct. 2317].) The affidavit must present the magistrate with facts indicating the circumstances underlying the affiant's belief in order that the magistrate may judge their persuasiveness for himself. (*Ibid.; Giordenello* v. *United States* (1958) 357 U.S. 480, 486 [2 L.Ed.2d 1503, 1509, 78 S.Ct. 1245]; *Nathanson* v. *United States* (1933) 290 U.S. 41, 47 [78 L.Ed. 159, 161, 54 S.Ct. 11].)

It is "axiomatic" that a warrant can authorize a search no broader "than the facts supporting its issuance." (*Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 250 [118 Cal.Rptr. 166, 529 P.2d 590], citation omitted.) The Constitution's requirement of specificity requires that the affidavit set forth a factual basis for inclusion in the warrant of each of the items to be seized.

 Here, the affidavit in support of the warrant was 32 pages in length. Yet, within those pages there was *not one single fact or suggestion* to sup-

---

group therapy" augmented by one-on-one sessions with a therapist. While apparently not explicitly required to keep a diary, appellant did so in order to "aid [him] in [his] problem, in [his] treatment." He used the diaries "in conjunction with" the therapy program and would not have written them "were it not for the therapy that [he was] receiving."

While appellant was not specifically required by the state to write the diary entries, the involuntary and indeterminate nature of his commitment to the hospital contains elements of compulsion which would be relevant on the issue of whether the privilege against self-incrimination prohibits the state's later attempt to use those diaries against him. However, I need not reach that issue in this case, since the diaries were inadmissible on other grounds.

port the notion that appellant possessed "writings" or "personal diary notations," or that, if he possessed such items, they would be located at his home. While the affidavit may have contained facts sufficient for probable cause to search for some of the items listed in the warrant, it certainly did not do so with regard to the diaries which were seized.

■■■ "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." (*Zurcher* v. *Stanford Daily* (1978) 436 U.S. 547, 556, fn. omitted [56 L.Ed.2d 525, 535, 98 S.Ct. 1970].) Although the affidavit may have stated facts which created a strong likelihood that appellant was the individual who abducted and killed the victim and that evidence of the crime might logically be found at his residence, these facts would not have justified the seizure of appellant's diaries.

The absence of probable cause in the affidavit was alone sufficient to invalidate the seizure of appellant's diaries. However, the two provisions of the warrant which purported to authorize their seizure were constitutionally invalid for an additional reason.

A warrant must meet the requirement that it "particularly describ[e] the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.) The description must be sufficiently particular so that " ' "[a]s to what is to be taken, nothing is left to the discretion of the officer executing the warrant." ' " (*Andresen* v. *Maryland* (1976) 427 U.S. 463, 480 [49 L.Ed.2d 627, 642, 96 S.Ct. 2737], citations omitted.) ■■■ This rule "is designed to prevent general exploratory searches which unreasonably interfere with a person's right to privacy. . . . The Penal Code demands reasonable particularity (§ 1529), and this requirement is held to be satisfied if the warrant imposes a meaningful restriction upon the objects to be seized." (*Burrows* v. *Superior Court, supra,* 13 Cal.3d at p. 249, citations omitted.)

■■■ Warrants which identify "articles . . . in general terms [which] are ordinarily innocuous and are not necessarily connected with a crime. . . . place[] no meaningful restriction on the things to be seized." (*Aday* v. *Superior Court* (1961) 55 Cal.2d 789, 796 [13 Cal.Rptr. 415, 362 P.2d 42].) A warrant so drafted "is similar to the general warrant permitting unlimited search, which has long been condemned." (*Ibid.,* citations omitted.)

That the warrant place a *meaningful* restriction on the items to be seized is particularly important in the context of document searches because of the extent to which an individual's privacy could unlawfully be invaded in car-

rying out a search. As Learned Hand once observed, "the real evil aimed at by the Fourth Amendment is the search itself, that invasion of a man's privacy which consists in rummaging about among his effects to secure evidence against him." (*United States* v. *Poller* (2d Cir. 1930) 43 F.2d 911, 914 [74 A.L.R. 1382].)

" ' "Even a particular[ized] warrant to seize [incriminating] papers alone, without mentioning the titles of them, may prove highly detrimental [to the right of privacy], since in that case, all a man's papers must be indiscriminately examined, and such examination may bring things to light which it may not concern the public to know, and which yet it may prove highly detrimental to the owner to have made public . . . ." ' " (1 LaFave, Search and Seizure (1978) § 2.6, p. 397, quoting from Taylor, Two Studies in Constitutional Interpretation (1969) pp. 67-68, quoting from 16 The Parliamentary History of England (1813) pp. 10-11, proceedings on Jan. 29, 1765.)

As has been more recently noted, "the particularity command of the fourth amendment, along with probable cause, is the only protection a citizen now has against a general search of his private papers." (*United States* v. *Abrams* (1st Cir. 1980) 615 F.2d 541, 547 [53 A.L.R.Fed 663].)

Here, the description of the "documentary evidence" to be seized pursuant to paragraph (2) of the warrant placed no meaningful limit on the officer's discretion concerning the scope of the search. The authorization to search extended to all such evidence "tending to show the whereabouts of Theodore Frank during March 14 and 15, 1978 . . . ." That search inevitably entailed a "general, exploratory rummaging" through all of appellant's papers, the very type of indiscriminate police conduct which the Fourth Amendment's particularity requirement specifically prohibits. (See *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 467 [29 L.Ed.2d 564, 583, 91 S.Ct. 2022]; *Griffin* v. *Superior Court* (1972) 26 Cal.App.3d 672, 694-695 [103 Cal.Rptr. 679]; *Lockridge* v. *Superior Court* (1969) 275 Cal.App.2d 612, 625 [80 Cal.Rptr. 223].)

Paragraph (8) of the warrant authorized a search no less intrusive than that of paragraph (2). In order to locate evidence to be used against appellant, the officers would have had not only to rummage through, but to *read* all of his "writings" in order to discover those which "could relate to the death of Amy [S.] and would indicate either participation and/or an interest in that death . . . ." No meaningful limitation was placed upon the scope of the search by this paragraph.

Graphic proof of the warrant's lack of particularity is the fact that many irrelevant papers were seized pursuant to this warrant. The police seized

fifty-one greeting cards, seven unused wedding announcements, six poems authored by appellant's daughter, two novels, one book of poetry, one Gestalt therapy paperback, six pages of notes and diagrams of various dance steps, thirty-two personal letters, nine Blue Book examinations, the guest list from appellant's 1977 wedding, newspaper clippings about the wedding, correspondence with attorneys in Kern County and Missouri, the sales brochure for an automobile, hundreds of pages of notes from Atascadero State Hospital therapy groups, family budget sheets, an Alcoholics Anonymous attendance certificate, advertisement brochures from a pipe company and a department store, a catalogue from a local learning center, and appellant's marriage dissolution decree from Missouri. Such indiscriminate seizure of items is strong indication that the warrant granted impermissibly broad discretion to the executing officers. (See *Andresen* v. *Maryland, supra,* 427 U.S. at p. 493 [49 L.Ed.2d at p. 650] (dis. opn. of Brennan, J.).)

The particularity requirement of the Constitution is supposed to avoid the evil of the "general warrant," thereby preventing "general, exploratory rummaging" through an individual's papers. The warrant requirement ensures that the scope of a search be as limited as possible. The warrant in the present case can scarcely be said to have been "reasonably specific." It authorized government agents to rummage indiscriminately through all of the possessions of appellant and his wife, including those that were innocent or innocuous, in a general quest for items "potentially relevant" to the crime under investigation.

This warrant placed no meaningful restriction on the scope of the search of appellant's papers. It authorized a search as extensive as that allowed by the "general warrants" which our founding fathers attempted to guard against when they placed the Fourth Amendment into our Bill of Rights. (See *Boyd* v. *United States* (1886) 116 U.S. 616, 624-630 [29 L.Ed. 746, 748-751, 6 S.Ct. 524].) The trial court's ruling upholding this warrant effectively takes us back to the days of general warrants which authorized the King's minions to invade a citizen's home and search without limit for evidence of suspected crime.

Since neither the affidavit nor the warrant comported with the Fourth Amendment's requirement of particularity, the seizure of appellant's personal diaries pursuant thereto was unlawful, and their introduction into evidence was error.

### III.

Although today's majority reverse the penalty verdict as a result of the erroneous admission of the diaries, I note an additional issue—heretofore

not dealt with in any of this court's decisions on the 1977 death penalty law—which would require reversal of the penalty phase verdict, even in the absence of error in admitting evidence of the diary entries. The issue was raised by the parties to this appeal in a supplemental brief filed after argument, and was explored at some length by this court in *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813]. The question is whether the penalty phase instructions were constitutionally deficient for failing to inform the jury how to consider mitigating factors proffered by the accused other than the factors enumerated in former Penal Code section 190.3.

## A.

In *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954], the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. . . . [¶] . . . [A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." (*Id.,* at pp. 604-605 [57 L.Ed.2d at p. 990], italics in original, fns. omitted.)

The high court reaffirmed this holding in *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869]. This court, too, has made clear that a constitutional death penalty scheme must direct the jury to " 'weigh the sympathetic elements of defendant's background against those that may offend the conscience.' " (*People* v. *Robertson* (1982) 33 Cal.3d 21, 58 [188 Cal.Rptr. 77, 655 P.2d 279], quoting *People* v. *Haskett* (1982) 30 Cal.3d 841, 863 [180 Cal.Rptr. 640, 640 P.2d 776].)

Clearly, if the jury must be permitted to give "independent mitigating weight" to whatever "aspect of [the] defendant's character or record . . . the defendant proffers as a basis for a sentence less than death" (*Lockett* v. *Ohio, supra,* 438 U.S. at pp. 604-605 [57 L.Ed.2d at p. 990]), the jury must be so informed. The commands of *Lockett* are not satisfied if mitigating evidence simply is admitted without accompanying directions authorizing the jury to *weigh* that evidence in its determination of penalty. Rather, the jury must be informed of the legal standards to which the evidence applies.

In California, the necessary "legal standards" are the factors listed in Penal Code section 190.3 and communicated to the jury via instructions.[11] In the present case, those instructions were former CALJIC Nos. 8.88.1 and 8.89, which told appellant's jury to "consider, take into account and be guided by" 10 specified factors and to arrive at a verdict of life imprisonment or death "[a]fter having considered all of the evidence in this case and having taken into account all the applicable factors *upon which you have been instructed.*" (Supp. Service pamp. No. 1 (1978), p. 84, italics added.[12])

Only one of the ten factors upon which appellant's jury was instructed even arguably conveyed the *Lockett* rule, i.e., former factor (j) (now, factor (k)). Pursuant to this factor, appellant's jury was authorized to take into account "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

However, this factor is not adequate to meet *Lockett*'s requirements. It authorizes the jury to consider only those circumstances which extenuate the gravity of *the crime*. It fails to tell the jurors that they are free to give independent mitigating weight to those aspects of an individual's character or record which do not pertain to "the crime" of which he was convicted. *Lockett* itself demonstrates the inadequacy of factor (j), for *Lockett* requires that a jury be allowed to consider as mitigation not merely "any of the circumstances of the offense" but *also* the "defendant's character and record." (438 U.S. at p. 605 [57 L.Ed.2d at p. 990].)

Indeed, this court has already recognized the inadequacy of the factor (j) language. In *People* v. *Easley, supra,* 34 Cal.3d 858, 878, this court explained that the factor (j) instruction "does not explicitly inform the jury that it may consider *any* mitigating factor proffered by the defendant. . . . [A] jury . . . could reasonably construe the instruction's language to permit consideration only of the circumstances that relate to the 'gravity *of the crime*' and not of circumstances that relate to the general character, family

---

[11]Penal Code section 190.3 is the relevant statute under both the 1977 death penalty legislation (which applies to appellant's crimes) and the current law enacted by initiative in 1978. All of the 10 factors enumerated in the 1977 version have been carried over into the 1978 law. Under the 1977 law, the jury instructions corresponding to Penal Code section 190.3 are former CALJIC Nos. 8.88.1 and 8.89. The current instructions under the 1978 law are CALJIC Nos. 8.84.1 and 8.84.2 (4th ed. 1979). Hereinafter all references to current CALJIC Nos. 8.84.1 and 8.84.2 are to this edition.

The 1978 law also contains one factor that was not listed in the 1977 law, but this difference is not relevant to the issues raised by the present appeal. (See Pen. Code, § 190.3, subd. (c) [adding the factor of "(t)he presence or absence of any prior felony conviction"].)

[12]Hereinafter all references to former CALJIC Nos. 8.88.1 and to 8.89 are to this edition.

background or other aspects of the defendant." (*Id.*, at p. 878, fn. omitted, italics in orig.)[13]

The *Easley* court did not reach the question of whether this language by itself was sufficient to meet the demands of *Lockett*, but it did indicate that there was "some force" to the argument that the instruction was "potentially confusing." (34 Cal.3d at p. 878.) Thus, to "avoid potential misunderstanding in the future," the court directed trial courts to supplement the language of the instruction with additional language based on *Lockett*. (*Ibid.*, fn. 10.)[14]

The question of the adequacy of this instruction arose again in *People* v. *Lanphear* (1984) 36 Cal.3d 163 [203 Cal.Rptr. 122, 680 P.2d 1081]. As this court explained, the instruction leads the jury to believe "that mitigating evidence relevant to the defendant's background and character, which may give rise to sympathy, is not entitled to the same consideration in weighing mitigating against aggravating factors as evidence that extenuates moral culpability." (*Id.*, at p. 168, fn. 1.) When viewed in combination with an erroneous instruction telling the penalty jury to disregard pity or sympathy for the accused (CALJIC No. 1.00 4th ed. 1979), the instructions are constitutionally inadequate, "[b]ecause they . . . fail[] to tell the jury that any aspect of the defendant's character or background [may] be considered mitigating and [may] be a basis for rejecting death even though it [does] not necessarily lessen culpability[.]" (36 Cal.3d at pp. 167-168.)

In this case, the court did not instruct the jury not to consider sympathy for appellant at penalty phase. Nor did any of the penalty phase instructions explicitly—and in so many words—forbid the jurors from considering mitigating factors beyond those enumerated in section 190.3. However, the instructions were worded in such a way that a reasonable juror was likely to conclude that the list of enumerated mitigating factors was exclusive. At the very least, a reasonable juror "could have interpreted the instruction[s]" in a manner contrary to *Lockett*. (Cf. *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 514 [61 L.Ed.2d 39, 45, 99 S.Ct. 2450].)

Appellant's jury was told that, after considering the evidence, "[y]ou shall consider, take into account and be guided by the following factors, if

---

[13]*Easley* dealt with instructions based on the 1978 death penalty law, rather than the 1977 statute at issue here. However, the language of factor (j) of Penal Code section 190.3 of the 1977 law was carried over verbatim as factor (k) of section 190.3 under the 1978 law.

[14]The CALJIC Committee has since responded, by redrafting the instruction to incorporate the *Lockett* language. CALJIC No. 8.84.1, subdivision (k) (4th ed. 1984 rev.) now directs the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime [and any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death]."

applicable . . . ." (CALJIC No. 8.88.1.) The jury was then given the list of 10 statutory factors. By telling the jurors that they were free to disregard factors which they found not to be "applicable"—and by failing to tell them that they were free to add any mitigating factors which were proffered by appellant—the instruction created a compelling inference that the list was an exclusive one. The reasonable juror, upon hearing this instruction, would conclude that the list was his or her exclusive "guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 192 [49 L.Ed.2d 859, 885, 96 S.Ct. 2909].)

This inference could only have been strengthened by the concluding instruction, CALJIC No. 8.89: "After having considered all of the evidence in this case and *having taken into account all the applicable factors upon which you have been instructed,* you shall determine whether the penalty to be imposed on defendant shall be death . . . ." Again, the jury was specifically told to apply the evidence to those factors on which it had been instructed, not to any others.

Under both the 1977 and 1978 death penalty laws, the jury hears the mitigating evidence and is instructed to "consider" all of it. Then, the instructions under both laws tell the jury to "take into account" and "be guided by" those applicable factors *"upon which you have been instructed."* (Current CALJIC No. 8.84.2; former CALJIC No. 8.89.) Thus, under both sets of instructions, the reasonable juror would likely conclude that the evidence must fit into one of the legal pigeon-holes in order to be weighed into the penalty decision. Both instructions, No. 8.84.1 and No. 8.84.2, repeatedly convey the idea to the jurors that they are to weigh only "the" mitigating factors "upon which [they] have been instructed."

The very most that can be said in favor of the 1977 instructions is that they are ambiguous, and that we cannot tell whether a reasonable juror would have understood them to restrict his or her use of mitigating evidence. This, of course, is not enough to allow this court to affirm a death sentence. " '*Woodson* [v. *North Carolina* (1976) 428 U.S. 280 (49 L.Ed.2d 944, 96 S.Ct. 2978)] and *Lockett* require us to remove any legitimate basis for finding ambiguity concerning the factors actually considered by [the sentencing body in imposing a judgment of death].' " (*People* v. *Easley, supra,* 34 Cal.3d at p. 879, quoting *Eddings* v. *Oklahoma, supra,* 455 U.S. at p. 119 [71 L.Ed.2d at p. 14] (conc. opn. of O'Connor, J.).)

B.

Several other state courts have reviewed jury instructions on mitigating factors to determine whether they comply with the Eight Amendment re-

quirement that the jury be authorized to give unrestricted consideration to any evidence which the defendant proffers as a basis for a sentence less than death. A look at some of these decisions illustrates why these instructions are inadequate.

The Pennsylvania Supreme Court, for example, invalidated its sentencing statute because it limited the mitigating factors which the sentencing authority could consider. (*Com.* v. *Moody* (1977) 476 Pa. 223 [382 A.2d 442, 447-450], cert. den. (1978) 438 U.S. 914 [57 L.Ed.2d 1160, 98 S.Ct. 3143].)[15] Pennsylvania law allowed the sentencer to consider, inter alia, "[t]he age, lack of maturity, or youth of the defendant *at the time of the killing.*" (18 Pa. Cons. Stat. Ann. § 1311(d), italics added; see *Com.* v. *Moody, supra,* at p. 447.) The Pennsylvania court, however, observed that this statute did not, by its own terms, allow the jury to consider the defendant's character and record *other* than at the time of the killing. (*Id.,* at p. 449-450.) This, the court held, violated the Eighth Amendment—notwithstanding the fact that the defendant was allowed under the same law "to present a broad range of mitigating evidence bearing on his character and record." (*Ibid.*) Like California's factor (j), the Pennsylvania mitigating factor allowed the jury to use this evidence *only* to establish extenuating circumstances at the time of the offense. Because the jury could not give the evidence independent mitigating weight if it did not bear on the offense itself, the factor was unconstitutionally narrow. (*Ibid.*)[16]

North Carolina has addressed *Lockett*'s concerns by requiring that the judge instruct the jury on any nonstatutory mitigating circumstance "proffered by and specifically requested by a defendant which is supported by the evidence and from which the jury might reasonably find mitigating value." (*State* v. *Stokes* (1983) 308 N.C. 634 [304 S.E.2d 184, 195-196, 198].) Thus California's factor (j) problem could not arise; if a North Carolina defendant presents mitigating evidence of his character or record which is not covered by one of the statutory factors, he is nonetheless entitled to an instruction which draws the jury's attention to the evidence, and

---

[15]*Moody* was decided a year before *Lockett,* and anticipated the holding of that case. The Pennsylvania court based its decision on *Woodson* v. *North Carolina, supra,* 428 U.S. 280, 304-305 [49 L.Ed.2d 944, 961]: " '. . . in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' " (*Com.* v. *Moody, supra,* 382 A.2d at p. 446.)

[16]Following *Moody,* the Pennsylvania Legislature amended the statute, so that a jury is now instructed to consider " '[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.' 42 Pa. C.S.A. § 9711(e)(8)." (*Com.* v. *Zettlemoyer* (1982) 500 Pa. 16 [454 A.2d 937, 958-959].)

instructs the jury that it is free to give the evidence independent mitigating weight.[17]

Other state courts have found the penalty phase instructions sufficient if the jury is explicitly informed that it may consider *any* mitigating circumstances suggested by the evidence. (See *People* v. *Free* (1983) 94 Ill.2d 378 [69 Ill. Dec. 1, 447 N.E.2d 218, 238], cert. den. (1983) 464 U.S. 865 [78 L.Ed.2d 175, 104 S.Ct. 200]; *State* v. *Linder* (1981) 276 S.C. 304 [278 S.E.2d 335, 339]; *State* v. *Coleman* (1979) 185 Mont. 299 [605 P.2d 1000, 1017], cert. den., 446 U.S. 970 [64 L.Ed.2d 831, 100 S.Ct. 2952], rehg. den. 448 U.S. 914 [65 L.Ed.2d 1177, 101 S.Ct. 34]; cf. *Neal* v. *State* (Miss. 1984) 451 So.2d 743, 761, fn. 11, cert. den., — U.S. — [83 L.Ed.2d 716, 105 S.Ct. 607].[18])

When the list of mitigating factors *is* limited, and fails to encompass all the mitigating evidence proffered by a defendant, courts have looked to whether the instructions as a whole convey the message that the jury is not bound by these factors in weighing the evidence. Where the reasonable juror might understand that a list of enumerated mitigating factors is exclusive, a death judgment must be reversed. Thus, in *Washington* v. *Watkins* (5th Cir. 1981) 655 F.2d 1346, certiorari denied (1982) 456 U.S. 949 [72 L.Ed.2d 474, 102 S.Ct. 2021], the Fifth Circuit reversed a death sentence in a Mississippi case. The jury there had been instructed: *"Now consider the follow-*

---

[17]North Carolina has even required the trial judge to explain fully the meaning of the statutory mitigating circumstances, where there is a danger that without such an explanation the jury will disregard mitigating evidence. In *State* v. *Johnson* (1979) 298 N.C. 47 [257 S.E.2d 597, 613-614], the North Carolina Supreme Court held that where a jury had previously been instructed on the M'Naghten test of criminal insanity (and had found the defendant sane), the trial judge was required to explain the difference between this test and the mitigating circumstance that "the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements if the law was impaired. . . ." Without such explanation, the court held, the jury might have failed to give independent mitigating weight to the defendant's penalty phase psychiatric evidence.

The North Carolina procedure may present other problems, not at issue here. By citing *State* v. *Stokes, supra,* I do not suggest, for example, that it would be constitutionally permissible for a trial judge to refuse an instruction on mitigating circumstances requested by the defense, on the grounds that the judge does not believe there is substantial evidence to support it. *Stokes* is cited here simply to illustrate the difference between a legislatively drawn, close-ended list of mitigating factors, to be applied without variation in all cases, and a flexible list which allows the jury to give independent mitigating weight to the defense evidence actually presented in a given case. With the latter kind of list, a trial judge has the ability to comply with *Lockett.* With the former type of list, he does not.

[18]In *Neal,* the Mississippi Supreme Court noted its previous approval of an "any other mitigating circumstances" instruction in *Gray* v. *State* (Miss. 1979) 375 So.2d 994, 1003-1004, certiorari denied (1980) 446 U.S. 988 [64 L.Ed.2d 847, 100 S.Ct. 2975]. Although *Neal* held that omission of such an instruction was not error in that case in view of the absence of an evidentiary basis for it, the court cautioned that "[a]s a matter of practice, such language should be employed in every case to avoid this troublesome point arising in the future." (451 So.2d at p. 761, fn. 11.)

*ing elements of mitigation in determining whether the death penalty should not be imposed:* One, that the defendant has no significant history of prior criminal activity and two, the defendant's age at the time of the capital murder."[19] (655 F.2d at p. 1367, italics in original.) The Fifth Circuit noted that the jurors had never been expressly told that this list was an exclusive one. But they *had* been told that the list of aggravating factors was exclusive, and they had been told to balance the factors "[i]f you find from the testimony that *one or more of the preceding elements of mitigation exist[s]* . . . ." (*Id.,* at p. 1370, italics in original.)

The court concluded that "a reasonable juror might well have been led to believe from the trial court's charge that . . . it was his sworn duty to consider *only* the two mitigating factors specifically enumerated in the charge." (*Id.,* at pp. 1370-1371, italics in original.) The possibility that a juror might understand the instruction in this way, the court held, rendered the death sentence invalid under *Lockett.* It was not sufficient to allow the defendant to present and argue mitigating evidence, if the jury believed that it could use this evidence *only* to determine whether or not the specified factors existed. (*Id.,* at pp. 1373-1375.)

As the court held: "[T]he State argues that Washington's counsel introduced some evidence of nonstatutory mitigating factors, and adverted to those factors in his closing argument. Both the district court's analysis and the State's argument on appeal, however, completely miss the point of the Supreme Court's holding in *Lockett.* Sandra Lockett also introduced evidence on nonstatutory mitigating factors, and also argued their relevance to the sentencer. The fatal flaw in *Lockett* was not the exclusion of evidence relating to nonstatutory mitigating factors, but the limitation on the sentencer's consideration of that evidence except as it related to the statutory mitigating factors." (*Id.,* at pp. 1374-1375.)

At least one other court has required the same unambiguous showing that the sentencing authority understood that it was free to give independent weight to all of the mitigating evidence proffered by the defendant, even where the sentencing authority was a judge rather than a jury. The Arizona Supreme Court set aside a death judgment in a case where the sentencing judge had considered all the defendant's psychiatric evidence and had determined that none of the statutory mitigating factors had been established. (*State* v. *McMurtrey* (1983) 136 Ariz. 93 [664 P.2d 637, 646], cert. den. (1983) 464 U.S. 858 [78 L.Ed.2d 161, 104 S.Ct. 180].) Reversal was required because it was not clear that the judge understood that he was re-

---

[19]These two mitigating factors are substantially equivalent to California's former Penal Code section 190.3, subdivisions (b) and (h).

quired, after finding no statutory mitigating factors, to "consider the offered evidence further to determine whether it in some other way suggests that the defendant should be treated with leniency." (664 P.2d at p. 646.)

In the present case, this court certainly cannot affirmatively say that the sentencing jury considered all the mitigating evidence, whether or not it fit one of the statutory factors. The instructions given to the jury compel just the opposite inference—that the jurors understood that they were restricted to the statutory list. Thus, as in *Washington* v. *Watkins, supra,* 655 F.2d 134, and in *State* v. *McMurtrey, supra,* 664 P.2d 637, this "ambiguity concerning the factors actually considered by the trial court" (*Eddings* v. *Oklahoma, supra,* 455 U.S. 104, 119 [71 L.Ed.2d 1, 14] (conc. opn. of O'Connor, J.)) would also compel a reversal of the death judgment. This court should hold that an expanded factor (j) instruction is constitutionally required.

**KAUS, J.,** Concurring and Dissenting.—

I

 I have no quarrel with the majority's conclusion that a number of the clauses of the search warrant in this case—those which the majority terms "boilerplate clauses"—are vulnerable to constitutional challenge. Although the detailed affidavit submitted to the magistrate provided more than sufficient probable cause both to support a belief that defendant may have committed the crimes at issue and to justify a search of his residence for specific items which the police investigation had revealed were related to the crimes—such as the locks of hair that had been removed from the victim and the pliers that had been used in committing the crimes—none of the facts alleged in the affidavit provided probable cause to believe that defendant had in his possession either documentary evidence of his whereabouts on the day of the crimes[1] or scrapbooks or the like related to this criminal activity.[2] If the challenged clauses were validly inserted in this warrant,

---

[1] The warrant was issued on October 18, 1978, some seven months after the crimes occurred.

[2] Ironically, although the facts in the affidavit do not provide probable cause with respect to the items listed in the general clauses of the warrant challenged here, there are facts in the affidavit which might have provided probable cause to support a clause which was directed more specifically at the pocket address books and datebook.

The affidavit related that between March 16 and March 19, 1978—within several days of Amy's kidnaping and murder—Erin Allen, who lived in the rural residence where Amy's body was discovered, received a series of telephone calls in which a male caller sobbed and stammered for about five seconds and then hung up. The affidavit provided the specific telephone number on which these calls were received.

Given the nature of the crimes and the timing of the phone calls, it may have been

there would be no reason why *every* search warrant could not similarly authorize the police to search *any* suspect's residence for personal diaries, telephone records, scrapbooks or other papers which might help the prosecution prove its case. Despite the gravity of the crimes at issue here, I agree with the majority that the Constitution does not permit such a practice.

## II

Where I part company with the majority is on several, somewhat more mundane, matters. The first point concerns the threshold question of whether defendant adequately raised at the trial court level the overbreadth issue on which the majority relies. While the opinion does acknowledge in a footnote that defendant's "objection to this evidence on the overbreadth of the warrant could have been more specific" (*ante*, p. 729, fn. 3), that brief statement does not fully capture the inadequacy of defendant's submission. To explain my difficulty with the majority's conclusion, I must review the relevant procedural background in a bit more detail.

As the majority recognizes, because the evidence in question was obtained in a search pursuant to a warrant, defendant bore the burden of demonstrating the inadmissibility of the challenged evidence. (See, e.g., *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 101 [104 Cal.Rptr. 226, 501 P.2d 234].) In his pretrial motion to suppress, defendant challenged the validity of the search warrant on a number of theories, contending (1) that the information on which it was based was "stale," (2) that the information was, in part, inaccurate, and (3) that the warrant was "overbroad." But while his motion purported to rely, inter alia, on "overbreadth," the motion's discussion of the issue was entirely inadequate to present the issue.

I set out the defendant's entire argument on the overbreadth issue in the margin.[3] Although the argument quoted excerpts from two opinions which

---

reasonable to infer that the person who had committed the offenses had written down the number of the phone at the scene of the crime and had placed these unusual calls. Once the police had probable cause to believe that defendant committed the crimes, this information may have provided probable cause to search defendant's home for a slip of paper, or a pocket telephone or address book, containing the specific phone number.

The police did not, however, request authorization to search for this potential evidence, and the warrant did not authorize a search for such evidence.

[3]Defendant's points and authorities stated:

"IX

"The Search Warrant Must Particularly Describe the Property to Be Seized. Nothing Should Be Left to the Discretion of the Officer. (Marron v. U.S. (1972) 275 U.S. 112; People v. Murray (1978) 77 Cal.App.3d 308, 143 Cal.Rptr. 502.)

"The Following Descriptions in Search Warrants Have Been Held Insufficient:

"(1) 'all books, records and bank statements and cancelled checks of the receipt and disbursement of money and any file or documents referring to Harold D. Miller, June

held portions of other search warrants to be overbroad, the motion left totally unanswered a number of fundamental and crucial questions. First, it did not indicate which clause or clauses in the warrant defendant was challenging as overbroad. The warrant contained 16 separate clauses, each of varying specificity, authorizing the search for different items and categories of items; defendant left the trial court simply to guess which of these clauses he was attacking. Second, the motion did not make clear whether defendant's challenge was based on the theory that the affidavit did not provide probable cause to support a search for the items referred to in a particular clause or whether it was based, instead, on the theory that the description of items in a particular clause was not sufficiently specific. Third, and finally, the motion did not indicate which of the numerous seized items defendant was seeking to suppress on the basis of the warrant's alleged overbreadth. At least since *Aday* v. *Superior Court* (1961) 55 Cal.2d 789, 797 [13 Cal.Rptr. 415, 362 P.2d 47], it has been clear that the invalidity of a portion of a warrant does not invariably taint all of the evidence seized pursuant to the warrant; defendant's motion, however, did not direct the court's attention to the address books or datebook, or—for that matter—to any other particular item, but simply sought the suppression of all evidence seized either with or without a search warrant.

Defense counsel's presentation at the hearing on the motion to suppress provided no elaboration or clarification of the overbreadth contention. While counsel presented evidence and additional argument with respect to his "staleness" and "misstatement" arguments, he simply submitted the overbreadth claim on the basis of his written motion.[4]

Trower, June Miller or Stacey Miller.' (Burroughs v. Superior Court (1974) 13 Cal.3d 238, 118 Cal.Rptr. 166.)

"(2) 'evidence of indebtedness . . . including but not limited to such items as bills, contracts, checkstubs, checks, handbooks . . . .' (Griffin v. Superior Court (1972) 26 Cal.App.3d 672, 103 Cal.Rptr. 379.)

"If the failure to include material information, though not intentional, is negligent, the omitted facts are added to the Affidavit and probable cause is tested in light of the additional information. (People v. Barger (1974) 40 Cal.App.3d 662, 668-669.)"

[4]The relevant portion of the transcript of the section 1538.5 hearing reads:

"Court: What was the other issue?

"Mr. Prager [district attorney]: That the defendant—

"Mr. Wiksell [defense counsel]: Over-broad.

"Mr. Prager: The question of whether the description in the warrant was over-broad.

"The Court: I assume you are submitting that.

"Mr. Wiksell: Yes.

"The Court: Because you didn't mention that. The Court finds that that portion of the affidavit is not overbroad and the motion is denied on that ground, also.

"Mr. Prager: Excuse me. The Court said that portion of the affidavit. I think the Court means the affidavit and the warrant.

"The Court: All right, the affidavit and the warrant.

"Mr. Prager: Thank you, sir."

Given the fact that defendant never directed the trial court's attention to the specific clauses of the warrant that he intended to challenge as overbroad, never clarified the theory of his claim of overbreadth, and never explained what potential evidence he was seeking to exclude, I do not believe we can properly find that the trial court erred in rejecting defendant's overbreadth contention. In short, defendant's objection was simply too inadequate to preserve the issue for appeal.

### III

The majority appears to acknowledge that the deficiency of the defense presentation in the trial court would preclude defendant from raising the overbreadth issue on appeal in an ordinary, noncapital case. (See *ante,* p. 729, fn. 3.) It concludes, however, that the flaws should be ignored here because this is a capital case, maintaining that we have long followed the rule in death penalty appeals that "a technical insufficiency in the form of an objection will be disregarded and the entire record will be examined to determine if a miscarriage of justice resulted." (*Ibid.*) While it may be appropriate to be more solicitous of "technical insufficienc[ies]" in evidentiary objections in capital appeals, the inadequacy here cannot be dismissed as a mere "technical insufficiency." What the majority's characterization overlooks is that because of the inadequate objection at the suppression hearing, the prosecution had no reason to present evidence which might have demonstrated that the notebooks in question were admissible at trial despite the overbreadth of a portion of the warrant. Since the inadequacy of the record makes it impossible to determine whether or not the notebooks were admissible, and since that inadequacy is directly attributable to the deficiency in defendant's motion, I do not see how we can disregard the deficiency for purposes of this appeal.

Although it does not expressly say so, the majority implicitly recognizes that the inclusion of the invalid clauses in the warrant in this case neither invalidates the warrant in toto nor renders inadmissible all evidence seized in the search conducted pursuant to the warrant: the locking pliers, on which the majority heavily relies in finding no prejudice at the guilt phase, were seized in the same search as the address books and datebook. While there is, of course, a distinction between the pliers and the notebooks—the pliers were properly included in the warrant whereas the notebooks were not—a number of cases have concluded that even if evidence is seized pursuant to an invalid portion of a search warrant, the evidence may still be admissible if the police would reasonably have discovered and properly seized the evidence while executing the valid portions of the warrant.

*People* v. *Atkins* (1982) 128 Cal.App.3d 564 [180 Cal.Rptr. 440] demonstrates the point. In *Atkins,* a search warrant was issued, authorizing a

search of the defendant's residence for five categories of evidence: (1) rug fibers, (2) hair of the victim, (3) stolen property, (4) clothing of the victim, and (5) pieces of glass. In the course of the search, the police officers seized a two-shilling English coin, apparently as "stolen property." On appeal, the defendant contended that the "stolen property" designation in the warrant failed to satisfy the constitutional requirement that the object of a search be specified with sufficient "particularity" to limit the officers' discretion and that, as a consequence, the coin had been improperly admitted in evidence.

The *Atkins* court rejected the argument, explaining: "Even were we to assume that the single category of 'stolen property' is overbroad and lacking in the requisite particularity, 'any thing properly seized as a result of an authorized search for articles properly described may be used in evidence.' [Citations.] Here, the officers necessarily engaged in an intensive inspection of defendant's room in conducting the authorized search for certain of the minute items. Where during the course of such an authorized search the coin was routinely discovered, as here, they were entitled to seize it as an item in plain view. [Citations.] The requisite nexus—facts from which a rational link between the item seized and criminal behavior can be inferred [citation]—was established from the English coin itself and the English heritage of the victim. In light of the totality of such circumstances, the coin, discovered in plain view during the course of the otherwise valid search, was properly subject to seizure and admissible in evidence." (128 Cal.App.3d at p. 570.)

Several cases from other jurisdictions have reached the same conclusion. In *People* v. *Hellemeyer* (1975) 28 Ill.App.3d 491 [328 N.E.2d 626], for example, police obtained a warrant to search a car for goods taken in three burglaries, but the appellate court concluded that the affidavit provided probable cause with respect to only one of the burglaries. Nonetheless, the court rejected the claim that the seized property relating to the other two burglaries should have been suppressed, reasoning: "As stated above, the search warrant did properly issue to search Hellemeyer's automobile for the goods taken in the Turf Lounge burglary. The inclusion of goods taken in the other two burglaries, while technically incorrect, did not prejudice the defendants. When an article subject to lawful seizure properly comes into an officer's possession in the course of a lawful search, that item may be used as evidence even though it was not one of the items that the officer was properly searching for. [Citations.] Thus, if the property taken from Rickhoff's Tavern and from Por O'Smitty's Tavern had not been mentioned in the search warrant in the instant case, the police could still have searched Hellemeyer's automobile and seized the property which had been taken in all three reported burglaries. All those items could have been used as evi-

dence against the defendants. A holding that the items could properly be seized if they were not included in the search warrant but that they could not be seized if they were included in the search warrant is without reason. Since probable cause was established to search Hellemeyer's automobile, the inclusion in the search warrant of items which were taken in burglaries other than the one at the Turf Lounge did not result in a greater invasion of Hellemeyer's privacy than was justified." (328 N.E.2d at pp. 631-632. See also *Com.* v. *Lett* (1984) 393 Mass. 141 [470 N.E.2d 110, 113-115]; *United States* v. *Fitzgerald* (8th Cir. 1983) 724 F.2d 633, 635-637; *State* v. *Noll* (1984) 116 Wis.2d 443 [343 N.W.2d 391, 395-399]; *Palmer* v. *State* (Ala.Crim.App. 1983) 426 So.2d 950, 952; *Com.* v. *Casuccio* (1982) 300 Pa.Super. 450 [454 A.2d 621, 629-631]; *United States* v. *Winston* (E.D.Mich. 1974) 373 F.Supp. 1005; *Butler* v. *State* (1973) 130 Ga.App. 469 [203 S.E.2d 558, 563].)

The doctrine reflected in these cases is not, however, without its proper limitations. In *People* v. *Haas* (1976) 55 App.Div.2d 683 [390 N.Y.S.2d 202], for example, the court—after concluding that there was probable cause to support a warrant's authorization to search for marijuana, but not its additional authorization to search for stolen goods—refused to uphold the seizure of the stolen goods, explaining: "The items seized, i.e., a passport, an envelope containing coins, certain documents, etc., are not the type of items in which a searcher for marijuana could reasonably expect to find marijuana, especially in view of the fact that the search warrant authorized a search for 'Marijuana Plants.' [Citation.] Furthermore, none of those items contain a brand of illegality, i.e., they are not contraband per se. Thus, the police would have had to scrutinize them carefully in order to know that they were stolen. [Citation.] We find that the type of foray into defendant's home pursuant to an imprecisely drawn search warrant is precisely the type of general exploratory search so abhorrent to the Constitution. . . ." (390 N.Y.S.2d at pp. 202-203. See also *United States* v. *LeBron* (8th Cir. 1984) 729 F.2d 533, 537-538.)

Taken together, these cases suggest that the admissibility of evidence seized pursuant to an invalid portion of a warrant may well turn on the nature and scope of the search that was lawfully authorized by the warrant and on the circumstances surrounding the execution of the warrant and the actual seizure of the items in question. (See generally 2 LaFave, Search and Seizure (1978) § 4.6(f), pp. 111-113; see also *id.,* § 4.11, pp. 163-184.)

How do these principles apply in this case? On the present record, we cannot tell. We do know that the warrant properly authorized a very extensive search of defendant's residence, permitting the police to search for items as small as the locks of hair that had been snipped from the victim's

head. The locks could have been hidden in the pocket address books or datebook, and the police, in leafing through them in search of the hair, could have properly discovered the incriminating nature of the books' contents in "plain view," providing the requisite nexus to justify the seizure of these items. (See, e.g., *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 465-471 [29 L.Ed.2d 564, 582-586, 91 S.Ct. 2022] [plurality opn.]; *People* v. *Hill* (1974) 12 Cal.3d 731, 761-763 [117 Cal.Rptr. 393, 528 P.2d 1].) On the other hand, the locks or similar small items may have been found before these books were discovered and seized, or the incriminating aspects of the books' contents might not have been discernible if the police had confined their inspection of the books to a search for the properly listed items. (See 2 LaFave, Search and Seizure, *supra*, § 4.6(f), pp. 112-113.)

On the record before us, all this is conjecture. As noted, because defendant did not properly raise the issue, the prosecution had no motivation to adduce detailed evidence with respect to the execution of the warrant, and the trial court was never required to determine whether—even if the warrant was partially overbroad—the seizure of the address books and datebook could properly be sustained on a plain-view-in-the-course-of-a-valid-search theory. Since defendant is responsible for the lack of an evidentiary record adequate to determine the admissibility of the books, I do not believe that he may properly challenge the trial court's ruling on this appeal.

### IV

Because I conclude that the trial court did not err in admitting the address books and datebook, I concur in the judgment insofar as it affirms defendant's conviction and the special circumstance findings. Since the majority concludes that the penalty judgment must be reversed because of the admission of those books, my views as to the additional penalty phase issues raised by defendant cannot affect the judgment. Accordingly, I express no opinion on those issues.

Grodin, J., concurred.

Respondent's petition for a rehearing was denied August 20, 1985, and the opinion was modified to read as printed above. Lucas, J., was of the opinion that the petition should be granted.