Filed 12/17/24  P. v. Adams CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CLIFFORD EDWARD ADAMS,<br><br>    Defendant and Appellant. | A168659<br><br>(Sonoma County Super. Ct. No. SCR-745268-1) |

Clifford Edward Adams appeals from his convictions for murder, attempted murder, assault with a deadly weapon, and reckless driving after he drove his car into a homeless encampment, killing one victim and injuring another.  He challenges the sufficiency of the evidence that he premeditated and deliberated over the murder and attempted murder; the trial court's decision to allow impeachment evidence concerning his drug use; the court's decision to sentence him under the Three Strikes law; and the court's order that, as part of his sentence, he repay the district attorney's office for the cost of impounding his car.  We direct the trial court to correct errors in the court's minutes and abstract of judgment with respect to the obligation to repay the impoundment fees, but we otherwise affirm the judgment.

1

# BACKGROUND

## A.

The killing occurred on the night of March 23, 2021, at a homeless encampment on Roberts Avenue in Santa Rosa. Adams drove his car into Michael Sullivan-Snell (known as "Big Mike") and ran over Kellie Jones, injuring Big Mike and killing Jones. Adams knew both victims; he socialized with Jones and others at the encampment, sold methamphetamine to Big Mike, and bought marijuana from him. In the days before the crash, Big Mike and Adams were involved in a dispute that culminated in a physical altercation the evening of the crash, when Big Mike punched Adams in the face and wrestled him to the ground at the encampment. The fatal crash happened later the same night.

The prosecution's theory was that Adams attempted to kill Big Mike but accidentally killed Jones instead. A defendant who tries to kill one person but instead kills a bystander is liable for both attempted murder and murder. (*People v. Concha* (2009) 47 Cal.4th 653, 660.) To obtain convictions for the first degree murder of Jones and the attempted murder of Big Mike under the prosecution's theory, the prosecution was required to prove, beyond a reasonable doubt, that the attempted killing of Big Mike was "willful, deliberate, and premeditated." (Pen. Code, § 189, subd. (a); *see also* Pen. Code, § 664.)[1]

A jury ultimately found Adams guilty of the first degree murder of Jones, with willfulness, premeditation, and deliberation (Pen. Code, §§ 187, subd. (a), 189, subd. (a); count one). The jury also found Adams guilty of the attempted murder of Big Mike (Pen. Code, §§ 187, subd. (a), 664; count two) and found that Adams acted willfully, deliberately, and with premeditation in committing that offense. The jury further found Adams guilty of assault with a deadly weapon (Pen. Code, § 245,

---

[1] Undesignated statutory references are to the Penal Code.

subd. (a)(1); count three) and reckless driving (Veh. Code, § 23103, subd. (a); count four). The jury also found true allegations that Adams personally used a deadly or dangerous weapon, personally inflicted great bodily injury on Jones and Big Mike, and proximately caused bodily injury to another person in connection with the foregoing offenses.

**B.**

The dispute between Adams and Big Mike initially concerned a designer backpack belonging to Adams's girlfriend, Catrina Thompson, that Big Mike took after she left it on the ground when she was intoxicated. The backpack contained various personal items. Although Big Mike knew the backpack belonged to Thompson, he held on to it and waited for someone to ask for the backpack. Big Mike ultimately removed the contents of the backpack and gave the backpack to his daughter for her birthday.

Thompson was "mad" about the backpack. When Adams asked about it, Big Mike informed him that he no longer had the backpack but he had its contents. Big Mike returned some – IDs and credit cards – but not all of the missing items. In the days leading up to March 23, the day of the crash, Adams contacted Big Mike four or five times, asking him about compensation for the backpack

On the evening of March 23, Thompson and Adams drove to the Roberts Avenue encampment, saw Big Mike, and spoke to him about the backpack. Big Mike became angry, reached through the driver's side window of the car, and punched Adams. As a result of the assault, Adams had a three-inch, bloody gash above his eye. Adams exited the car with a machete and began grappling with Big Mike. Big Mike was 6 feet 7 inches tall and about 100 pounds heavier than Adams, who was six feet tall. Big Mike "[got] the best of [Adams]," wrestled him to the ground, took the machete from him, and got on top of him. Adams had to ask

3

Big Mike to let him up, which he did.  There were "a lot of people around" who knew Adams and saw Big Mike take him down.  Angry, Adams drove off with Thompson in his car.

When Adams and Thompson returned to their residence, Big Mike rode up on his bicycle and taunted the couple.  According to Thompson, Big Mike threatened them by shouting, "I know where the fuck you live."  Adams and Thompson were "angry" and yelling as Big Mike rode away.

After Big Mike left, Thompson and Adams spoke with Thompson's cousin, Robert Thomas, and told him what had happened with Big Mike.  Thomas recounted at trial that Adams told him "he was going to go mess up this dude that just beat him up, Big Mike."  And Thomas testified that Adams was "upset" and looking for a gun, but Adams was unable to locate one.  Adams acknowledged telling Thomas he was going to "mess that dude up," referring to Big Mike, but testified he did not remember asking him about a gun.  Thomas, who was friends with both Adams and Big Mike, offered to talk to Big Mike to defuse the situation.

Between 45 minutes and two hours after the altercation, Big Mike returned to the encampment.  Subsequently, Adams, Thompson, and Thomas all arrived at the encampment by car.[2]  Around the time that Adams drove up, Jones, a resident of the encampment, was sitting on a mattress, coloring, and Big Mike was sitting with her.

John Clay, Jr., an acquaintance of both Adams and Big Mike, testified that after Adams drove up to the encampment, he walked up to Adams's car to say "hi."  Clay recounted that Adams, who "still looked upset from the fight earlier that day,"

_____

[2] Adams and Thompson testified that Adams picked Thomas up and drove him to the encampment, but Thomas testified that he arrived in another friend's car.

4

said to Clay, "I need your help tonight." Clay took Adams to be asking for help getting back at Big Mike. Clay declined, stating that he had enough problems of his own. Clay told Adams, "it's not worth it, just over this little stupid little interaction or fight between you and Mike to spend the rest of your life in prison." At trial, Adams denied speaking to Clay before the crash.

Adams drove slowly to the end of the cul-de-sac on Roberts Avenue, made a U-turn, and stopped his car for "a few minutes" as he waited for Thomas. Big Mike estimated that Adams sat in his car for five to 10 minutes before the crash. While he waited, Adams left his car in drive, with the engine running, headlights on, and window closed. Adams's car was "facing towards where" Big Mike and Jones were, giving Adams an unobstructed view of the two in his headlights. Big Mike and Jones were between 23 and 39 feet away from where Adams's car was stopped.

According to Thompson, after Thomas went to try to talk to Big Mike, Big Mike became agitated. Adams testified that Big Mike was making aggressive gestures at him and "jumping" as if he was going to come after Adams again. Adams recounted that after Big Mike "stood up like he was coming [his] way," his fists balled, Adams "took off in the car." Adams asserted that he felt scared Big Mike was going to punch him again. Adams stepped on the gas, trying to "get away from this dude."

Adams drove his car "straight" into Jones's campsite, where Adams knew Big Mike had been "sitting an instant before." The car drove over some pallets, knocked Big Mike through a fence, and landed on Jones, pinning her to the ground. According to Clay, the car "was pointed right at [Jones] and [Big] Mike" and "was accelerating the whole time until" impact. Big Mike similarly testified that the car was accelerating and "coming straight toward" him. And Thomas testified that Adams "[d]rove straight at [Big] Mike."

5

At trial, Adams testified that he intentionally hit the gas pedal, but he did not intend to hit anyone with his car. He testified that he was thinking clearly at the time, his judgment and reasoning were not impaired by intense emotion, and he never thought he had to use deadly force to save himself or anyone else.

Immediately after the crash, Adams tried to put the car in reverse, but was unable to back the car up. Adams fled the scene, left town, and got a new cellphone.

The police subsequently recovered several weapons from Adams's car, including a hatchet, a machete, and two baseball bats; the machete and hatchet were on the driver's side seat.

## C.

During the ensuing investigation, Thompson told police that Adams's "drug use the day of March 23rd and around that time [¶] . . . [¶] . . . was increasingly excessive." As a result of his methamphetamine use, said Thompson, Adams was "jumpy," "erratic," and "moody." In addition, Thompson told the police that when the couple was driving back to the encampment before the crash, Adams "was extremely pissed."

At trial, however, when cross-examined by the People, Thompson denied making these statements to the police. Thompson acknowledged that both she and Adams had used methamphetamine earlier in the day on March 23rd. As for his demeanor shortly before the crash, Adams seemed "spacey" to Thompson and "kind of annoyed maybe" but was not "worked up." Over the defense's objection, the trial court allowed the prosecution to impeach Thompson's testimony with the statements she had made to police about Adams's drug use. The prosecution also introduced evidence of Thompson's statement that Adams had been "extremely pissed."

6

## D.

The prosecution argued that before crashing into Big Mike and Jones, Adams decided to kill Big Mike because Big Mike had humiliated him by taking him down in front of numerous community members at the Roberts Avenue encampment.

The defense presented several alternative theories at trial. Its primary argument was that the crash was an accident: Adams had returned to the encampment hoping that Thomas could defuse the dispute, but became scared that Big Mike would attack him again, so he hit the gas pedal to try to get away from him and unintentionally crashed into Big Mike and Jones. In support of that account, the defense introduced expert testimony by a forensic psychologist, Dr. Sabina Correa, who explained that a person who believed he was in danger could experience a fight or flight response, which could affect decision-making and cause the person to flee a perceived threat of immediate harm. On cross-examination, Dr. Correa testified that a person experiencing a fight or flight response could also engage in goal-oriented behavior, that a person's emotions could influence his behavior, and emotions like anger or embarrassment could motivate a person to kill.

In the event that the jury concluded that Adams intentionally sought to run Big Mike over with his car, the defense also argued that Adams acted in self-defense, which would render the killing or attempted killing lawful, or imperfect self-defense, which would reduce his liability to a lesser offense. In the alternative, the defense argued that Adams was provoked and acted in the heat of passion, which would also reduce his liability to a lesser offense.

## E.

At sentencing, Adams requested that the trial court exercise its discretion not to sentence him under the Three

7

Strikes law. The Three Strikes law creates a presumption in favor of "harsher sentence[s]" for individuals with repeated serious or violent felony convictions (prior "strikes"). (*People v. Salazar* (2023) 15 Cal.5th 416, 428 [citing *People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*)].) Section 1385, subdivision (a), allows a trial court limited discretion to depart from the Three Strikes sentencing scheme "in furtherance of justice." (*See Carmony*, at pp. 377-378; *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 504 (*Romero*).)

Adams's criminal history included 21 prior felony convictions between 1988 and 2019. For purposes of sentencing under the Three Strikes law, the trial court found that Adams had two strikes based on a 1988 robbery and 1993 offenses involving robbery and assault with a firearm. His conviction history also included several theft-related offenses; brandishing an imitation firearm; being a felon in possession of a firearm; drug possession; delivery of cocaine; larceny; assaulting a government official or employee; escape from jail; and third degree robbery. In addition, Adams had several parole or probation violations.

In urging the trial court to strike his prior strikes, Adams argued that his strikes were committed over 30 years before the present offenses and that "he was becoming less violent, not more," given that his convictions in the last decade were limited to non-violent theft and drug offenses. Adams maintained that his recidivism risk was low given his age (56 at the time of sentencing). In addition, Adams argued that his mental illness (schizoaffective disorder, depression, and post-traumatic stress disorder) also served as a mitigating factor. Further, Adams submitted a letter from his sister about his difficult upbringing, and asserted in support of his request that he suffered a traumatic childhood as the result of his mother's neglect and abuse, which led to him and his siblings abusing both drugs and

8

alcohol beginning when Adams was in elementary school.  He also argued that the present offenses were preceded by provocation.

The trial court denied Adams's request to strike his prior strikes.  The court sentenced him to an aggregate sentence of 100 years to life imprisonment with a consecutive determinate sentence of 14 years.  The court imposed a $300 restitution fine, suspended a second $300 restitution fine, and ordered that Adams pay $1,373 in restitution to the victim compensation board.  Finally, the court ordered that Adams pay $11,899 to the Sonoma County District Attorney's office for "impound fees."

## DISCUSSION

### A.

Adams contends that his convictions for first degree murder and attempted murder must be reversed due to insufficient evidence of premeditation and deliberation.  Reviewing the whole record in the light most favorable to the judgment (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419 (*Halvorsen*)), we conclude the jury's verdict was supported by substantial evidence.

An action is " 'deliberate' " when the actor thinks carefully and weighs considerations for and against the potential action before proceeding.  (*See People v. Memro* (1995) 11 Cal.4th 786, 862-863 (*Memro*).)  And an action is " 'premeditated' " when the action was " 'considered beforehand.' " (*Id.* at p. 863.)  A person can premeditate and deliberate quickly, in an abbreviated time frame.  (*See ibid.*; *see also People v. Perez* (1992) 2 Cal.4th 1117, 1127 (*Perez*).)

Our Supreme Court has identified three non-exclusive categories of evidence that can suffice to establish premeditation and deliberation: evidence of (1) planning activity, (2) motive, and (3) the manner or method of killing.  (*People v. Morales* (2020) 10

9

Cal.5th 76, 88-89 (*Morales*); *see also, e.g., People v. Tafoya* (2007) 42 Cal.4th 147, 172 (*Tafoya*); *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462 & fn. 8, disapproved of on other grounds by *People v. Mesa* (2012) 54 Cal.4th 191; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*).)  Planning activity, or facts about the defendant's actions prior to the killing, can show that the defendant's activities were directed toward or intended to result in the killing.  (*Morales*, at p. 89.)  Evidence of motive – e.g., facts concerning the defendant's prior relationship or conduct with the victim that support a motive for killing the victim – could, when combined with evidence as to planning activity or the method of killing, support an inference that the killing occurred due to careful reflection rather than hasty impulse.  (*Ibid*.)  In addition, in some circumstances the particular nature of the killing can give rise to an inference that the defendant must have acted with deliberation and forethought to kill the victim, when combined with evidence of planning or motive.  (*Ibid*.)  Courts have upheld findings of deliberation and premeditation based on extremely strong evidence of planning activity or based on evidence of motive in combination with evidence of either planning activity or the method of killing. (*People v. Haskett* (1982) 30 Cal.3d 841, 849, fn. 1 (*Haskett*); *see also Anderson*, at pp. 28-30.)  The method of killing alone (for example, an execution-style killing) can also establish that the killer acted with deliberation and premeditation.  (*Tafoya*, at p. 172; *Memro*, *supra*, 11 Cal.4th at pp. 863-864.)

Here, the jury's verdict was supported by strong evidence of motive as well as evidence of planning activity.  As to motive, Adams had been involved in a dispute over the course of several days with Big Mike, who had stolen Thompson's designer backpack.  Thompson, Adams's girlfriend, was upset and angry. The evening of the killing, Big Mike had sucker punched Adams, leaving him with a bloody gash on his face, and then wrestled him to the ground in front of Thompson and several other

10

onlookers who knew Adams. Big Mike had gone to the couple's residence and threatened them. The jury heard evidence that when Adams was driving back to the encampment before the crash, he "was extremely pissed." Based on this evidence, the jury could have reasonably concluded that Adams sought to kill Big Mike in retribution for assaulting, threatening, and humiliating him.

The prosecution also presented evidence that Adams planned to kill Big Mike. Thomas testified that Adams asked him about a gun and told him "he was going to go mess up" Big Mike. (*Cf. People v. Williams* (1997) 16 Cal.4th 635, 681 [explaining that suspect's "comment about killing everyone reflected planning activity"].) In addition, Adams drove to the encampment, a location he knew Big Mike frequented, with several weapons (a hatchet, machete, and baseball bats) in his car. (*See People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192 [explaining that the defendant's planning activity included obtaining a gun and driving a car to look for a victim]; *see also People v. Frank* (1985) 38 Cal.3d 711, 733 [recounting that defendant's planning activity included driving to the location of the killing]; *Haskett, supra*, 30 Cal.3d at p. 850 [recognizing that obtaining a weapon in advance of the killing constitutes planning activity].) After arriving at the encampment, Adams asked Clay for help, and Clay declined, with the understanding that Adams was asking him for help getting back at Big Mike. Adams made a U-turn and stopped his car with his headlights pointing toward Big Mike and Jones. Adams admitted he sat in his car for a few minutes, with the engine running and the gear shift in drive.

In addition, the manner of killing was, at a minimum, consistent with a finding of premeditation and deliberation. Several witnesses testified that once Adams's car started moving, the vehicle travelled straight toward the victims and accelerated until the impact. The fact that the car travelled approximately

11

23 to 39 feet straight toward Big Mike supported the jury's conclusion that Adams acted purposefully to kill him.

The jury reasonably could have found that Adams wanted to kill Big Mike, considered a few different methods, and then, after he failed to obtain a gun from Thomas or help from Clay, Adams settled on using his car. (*Cf. Perez*, *supra*, 2 Cal.4th at p. 1127 [evidence that the defendant sought out a second weapon when the first weapon broke supported a finding of premeditation and deliberation]). The jury could have inferred that Adams positioned his car and kept his car in drive because he was contemplating running Big Mike down with it. Further, shortly before Adams stepped on the gas pedal, Clay warned him that the dispute with Big Mike was not worth spending the rest of his life in prison. The jury could have further inferred that during the minutes that Adams spent sitting in his vehicle with the motor running, watching Big Mike, Adams weighed his options, considered the consequences, and resolved to run Big Mike over with his car. (*Perez*, at p. 1127 [explaining that "premeditation can occur in a brief period of time. . . . . 'with great rapidity' "]; *see also Halvorsen*, *supra*, 42 Cal.4th at pp. 420-421 [concluding that a 10-minute interval during which the defendant encountered and killed two victims who were strangers to him was not too brief a period to support jury's finding of premeditation and deliberation].) Adams testified that when he was sitting in his car before the crash, he was thinking clearly, his reasoning and judgment were not impaired, he knew where Mike was located, he knew he was stepping on the gas pedal when he did, and he acted intentionally when he hit the gas pedal. In light of the evidence, the jury reasonably found that Adams acted with deliberation and premeditation.

Adams contends that the fact that the killing occurred in front of numerous bystanders who were able to identify him supports a conclusion that he acted rashly, without

12

premeditation and deliberation. But the fact that "the location of the killing was not ideal does not negate an inference that it was planned." (*People v. Casares* (2016) 62 Cal.4th 808, 826 (*Casares*), disapproved of on other grounds by *People v. Dalton* (2019) 7 Cal.5th 166.) Moreover, reversal of the judgment is not justified simply because there may be competing inferences that the jury could have drawn, but did not. (*Casares*, at p. 827; *see also People v. Avila* (2009) 46 Cal.4th 680, 703.)

## B.

Adams argues that the trial court abused its discretion in allowing the prosecution to impeach Thompson, a defense witness, with evidence concerning Adams's drug use. Adams maintains that the evidence of his drug use should have been excluded because it was not relevant to any issue in the case other than Thompson's credibility. We disagree.

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Evidence Code section 780 permits consideration of "any matter that has any tendency in reason to prove or disprove the truthfulness" of a witness's testimony, including "[a] statement made by [the witness] that is inconsistent with any part of [the witness's] testimony at the hearing." (Evid. Code, § 780, subd. (h).) It is improper for a party to elicit otherwise irrelevant testimony solely for the purpose of contradicting it, but whether to admit or exclude impeachment evidence on a collateral matter is within the trial court's discretion. (*See People v. Mayfield* (1997) 14 Cal.4th 668, 748 (*Mayfield*), abrogated on other grounds by *People v. Scott* (2015) 61 Cal.4th 363; *see also People v. Lavergne* (1971) 4 Cal.3d 735, 744.)

Here, Adams challenges the trial court's decision to allow the prosecution to impeach Thompson's testimony with evidence that his drug use "the day of March 23rd and around that time"

13

was "increasingly excessive," which caused him to be "moody," "jumpy," and "erratic."

The trial court did not abuse its discretion in admitting the evidence in the circumstances here. The impeachment evidence concerned Adams's mental and emotional state at the time, a key issue at trial. His mental state was directly at issue given the murder and attempted murder charges, which required proof of intent to kill, premeditation, and deliberation. (*See* §§ 187, subd. (a), 188, subd. (a)(1), 189, subd. (a).) The jury heard evidence from Dr. Correa, the defense expert, that "emotions can motivate a person's behavior" and that "emotions such as anger or embarrassment could bring a person to kill." Both parties' closing arguments sought to characterize Adams's emotional state at the time of the crash. The prosecution relied heavily on evidence of the "emotional impact" of Big Mike's actions on Adams's "state of mind," arguing that Adams was angry and embarrassed and sought revenge as a result. And the prosecution argued that Adams made "a cold, calculated decision even if it was a horrible, irrational, unreasonable decision." The defense described the conflict with Big Mike as "terrifying" and "scary" for Adams. The defense also acknowledged that Adams was "probably upset and vulnerable" and "was experiencing significant anger after" being assaulted by Big Mike, but the defense maintained that Adams's anger did not mean he resolved to commit murder. Thompson's statements about the impact of his drug use on his emotional state, combined with evidence that Adams had done methamphetamine that day, had a tendency to support the prosecution's theory that Adams made an unreasonable decision to kill Big Mike as retribution for assaulting and humiliating him. If Adams was indeed "moody," "jumpy," and "erratic" at the time, it would support a conclusion that Adams was more prone to act on his emotions, including his anger. Further, the evidence of Adams's emotional state was relevant not only to the deliberation and premeditation issues,

14

but also to the defense argument that he acted rashly, in the heat of passion.

That Adams may have been moody, jumpy, and erratic was also relevant to his complete self-defense argument. The defense argued that Adams "reasonably believed that he was in imminent danger" immediately before the crash, but evidence that his use of methamphetamine made him moody, jumpy, and erratic at the time could support a conclusion his assessment of the threat may have been unreasonable, particularly given the defense's acknowledgment during its closing argument that Adams's "li[fe] of drug abuse" compromised his "ability to perceive events accurately."

Further, because Thompson was the only witness other than Adams who was able to address his actions and demeanor inside the car immediately before the crash, her credibility was of critical importance; the impeachment evidence could have assisted the jurors in evaluating her testimony. (*See Mayfield*, *supra*, 14 Cal.4th at p. 748 [affirming the trial court's decision to admit impeachment evidence where the "testimony concerned defendant's actions during the [relevant] time" and the evidence could have assisted the jury in evaluating the testimony of the only eyewitness].) The trial court did not abuse its discretion in admitting the evidence.

## C.

Adams next contends that the trial court abused its discretion in declining to dismiss his prior serious felony convictions for sentencing purposes under section 1385, subdivision (a), and *Romero, supra*, 13 Cal.4th 497. His contention lacks merit.

In deciding whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under section 1385, subdivision (a), the trial court must consider

whether, because of the particular circumstances of the defendant's current conviction, prior serious and/or violent felony convictions, and background, character, and potential for rehabilitation, the defendant falls outside the spirit of the Three Strikes sentencing scheme. (*Carmony*, *supra*, 33 Cal.4th at p. 377.) A trial court's decision not to depart from a Three Strikes sentence will amount to an abuse of discretion only in "limited circumstances," such as where the court was unaware of its discretion or relied on improper considerations, or where the imposition of the Three Strikes sentencing scheme results in " ' an "arbitrary, capricious or patently absurd" result.' " (*Id*. at p. 378.)

Here, the trial court considered the applicable factors and reached a decision that was neither arbitrary nor irrational. The court found that Adams had two strikes, one based on a 1988 robbery and a second strike from 1993 involving robbery and assault with a firearm. The court expressly considered his particular "background, character, and prospects," including his sister's letter discussing his difficult childhood. The court also recognized that the two strikes were from "quite a long time ago." But the court emphasized that Adams, who had a total of 21 felony convictions, had "an extensive criminal history" between the current offenses and his prior strikes, with the time in between "filled with felony and misdemeanor conduct" as well as supervision violations. His history "include[d] 11 separate felony cases involving either felony drug convictions, property crimes or weapons possessions." The court noted that Adams had admitted selling drugs recently and was convicted for such activity in 2017 and 2019, with the current offenses occurring just five months after he was released from prison in connection with his 2019 conviction. The court observed that "the only gaps with Mr. Adams'[s] [criminal] history [we]re periods of incarceration." As a result, his history "does not paint a picture to the Court of a law

16

abiding or reformed lifestyle," and the court declined to strike his prior strikes.

Adams points to several considerations potentially weighing in favor of dismissing his prior strikes. For example, he asserts that none of his felony convictions between his last strike in 1993 and the current offenses involved violence or the threat of violence. He contends that even without a Three Strikes sentence, he likely would have received a lengthy term of imprisonment. And he maintains that his age, upbringing, mental illness, and other personal circumstances favor dismissal of his prior strikes. But despite circumstances favoring his position, the trial court's conclusion that Adams fell within the spirit of the law given his extensive history of felony convictions was not unreasonable. (*See Carmony*, *supra*, 33 Cal.4th at p. 379 [explaining that the Three Strikes law is designed to address " 'the "revolving door" career criminal' "].) Even if we might have arrived at a different determination in the first instance, we must nonetheless affirm where, as here, the sentencing court considered the relevant circumstances and reached a decision consistent with the law. (*Id.*, at p. 378.)

**D.**

Finally, Adams contends that the trial court erred in ordering him to pay $11,899 in restitution to the district attorney's office, even though the district attorney's office is not a victim entitled to restitution. We disagree that the court ordered restitution to the district attorney's office, but we remand for the court to correct errors in the court's minutes and abstract of judgment.

At the sentencing hearing, the court ordered Adams to pay "$11,899 . . . to the Sonoma County District Attorney's office for the impound fees" incurred in connection with his car. It is undisputed that the court's order was authorized by Vehicle Code section 22655.5, subdivision (d), which provides that "[i]n any

17

prosecution of the crime for which a vehicle was impounded" as relevant here, as evidence of a crime or because it was used to commit a crime, "the prosecutor may request, and the court may order, the perpetrator of the crime, if convicted, to pay the costs of towing and storage of the vehicle, and any administrative charges." The trial court did not regard the repayment of the impound fees as victim restitution, because the court stated that the "victim compensation and victim restitution" should be "paid first," before the impound fees. Although the trial court did not expressly invoke Vehicle Code section 22655.5, subdivision (d), we presume the court knew and followed the applicable law. (*See People v. Picazo* (2022) 84 Cal.App.5th 778, 802.)

However, as the People acknowledge, the court's minutes mistakenly state that "$11,899 restitution [is to be paid] to the Sonoma County District Attorney's office for car impound fees." The abstract of judgment, in turn, does not characterize the obligation to repay the impound fees as restitution, but as the People further acknowledge, it omits reference to the authorizing statute, Vehicle Code section 22655.5, subdivision (d). We therefore order that the minutes be conformed to the sentence orally pronounced by the court and that the abstract of judgment be clarified. (*See People v. Myles* (2012) 53 Cal.4th 1181, 1222, fn. 14.)

## DISPOSITION

The trial court is directed to prepare amended minutes of the June 20, 2023, sentencing hearing to clarify that the order to repay $11,899 to the Sonoma County District Attorney's Office for car impound fees is not for purposes of victim restitution. The court is further directed to prepare an amended abstract of judgment clarifying that the defendant's obligation to repay $11,899 in impound fees is pursuant to Vehicle Code section 22655.5, subdivision (d), and forward a certified copy to the

18

California Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.


                                                    BURNS, J.

WE CONCUR:


JACKSON, P.J.
CHOU, J.

*People v. Adams (A168659)*


19